## MATTER OF HEFF.

### ORIGINAL.

No. 14.    Argued January 9, 10, 1905.—Decided April 10, 1905.

The recognized relation between the Government and the Indians is that of a superior and an inferior, whereby the latter is placed under the care of the former. The Government, however, is under no constitutional obligation to continue the relationship of guardian and ward and may, at any time and in the manner that Congress shall determine, abandon the guardianship and leave the ward to assume and be subject to all the privileges and burdens of one *sui juris*.

In construing a statute affecting the relationship of the Government and the Indians it is not within the power of the courts to overrule the judg-

ment of Congress. While there may be a presumption that no radical
change of policy is intended, and courts may insist that a supposed
purpose of Congress to change be made clear by its legislation, when
that purpose is made clear the question is at an end.

Under the act of February 8, 1887, 24 Stat. 388, an Indian who has received
an allotment and patent for land is no longer a ward of the Government
but a citizen of the United States and of the State in which he resides,
and, as such, is not within the reach of Indian police regulations on the
part of Congress, and this emancipation from Federal control cannot be
set aside without the consent of the Indian or the State, nor is it affected
by the provisions in the act subjecting the land allotted to conditions
against alienation and encumbrance, and guaranteeing him an interest
in tribal or other property.

In the United States there is a dual system of government, National and
state, each of which is supreme within its own domain and it is one of
the chief functions of this court to preserve the balance between them.

The general police power is reserved to the States subject to the limitation
that it may not trespass on the rights and powers vested in the National
Government.

The regulation of the sale of intoxicating liquors is within the power of the
State and the license exacted by the National Government is solely for
revenue and is not an attempted exercise of the police power.

The act of January 30, 1897, 29 Stat. 506, prohibiting sales of liquors to
Indians, is a police regulation and does not apply to an allottee Indian
who has become a citizen under the act of February 8, 1887.

On October 15, 1904, petitioner was convicted in the District Court of the United States, District of Kansas, under an indictment charging that he did "unlawfully sell, give away and dispose of certain malt, spirituous and vinous liquors, at the town of Horton, in the county of Brown, in the State and District of Kansas, to John Butler, to wit, two quarts of beer, more or less, and he, the said John Butler, being then and there an Indian, a member of the Kickapoo tribe of Indians and a ward of the Government, under the charge of O. C. Edwards, an Indian superintendent, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States of America." Upon such conviction he was sentenced to imprisonment in the county jail of Shawnee County, Kansas, for a period of four months, and to pay a fine in the sum of two hundred dollars and the costs of the prosecution. The Court of Appeals of the Eighth Circuit

having decided the question involved, *Farrell* v. *United States*, 110 Fed. Rep. 942, adversely to his contention, he presented this application for a writ of *habeas corpus* directly to this court.

The act of Congress, January 30, 1897, 29 Stat. 506, provides:

"That any person who shall sell, give away, dispose of, exchange, or barter any malt, spirituous, or vinous liquor, including beer, ale, and wine, or any ardent or other intoxicating liquor of any kind whatsoever, or any essence, extract, bitters, preparation, compound, composition, or any article whatsoever, under any name, label, or brand, which produces intoxication, to any Indian to whom allotment of land has been made while the title to the same shall be held in trust by the Government, or to any Indian a ward of the Government under charge of any Indian superintendent or agent, or any Indian, including mixed bloods, over whom the Government, through its departments, exercises guardianship, . . . shall be punished by imprisonment for not less than sixty days, and by a fine of not less than one hundred dollars for the first offense and not less than two hundred dollars for each offense thereafter."

The act of Congress, February 8, 1887, 24 Stat. 388, is entitled "An act to provide for the allotment of lands in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and the Territories over the Indians, and for other purposes." Section 1 of that act provides:

"That in all cases where any tribe or band of Indians has been, or shall hereafter be, located upon any reservation created for their use, either by treaty stipulation or by virtue of an act of Congress or executive order setting apart the same for their use, the President of the United States be, and he hereby is, authorized, whenever in his opinion any reservation or any part thereof of such Indians is advantageous for agricultural and grazing purposes, to cause said reservation, or any part thereof, to be surveyed, or resurveyed if necessary,

and to allot the lands in said reservation in severalty to any Indian located thereon in quantities as follows: . . ."

"Sec. 4. That where any Indian not residing upon a reservation, or for whose tribe no reservation has been provided by treaty, act of Congress, or executive order, shall make settlement upon any surveyed or unsurveyed lands of the United States not otherwise appropriated, he or she shall be entitled, upon application to the local land office for the district in which the lands are located, to have the same allotted to him or her, and to his or her children, in quantities and manner as provided in this act for Indians residing upon reservations; and when such settlement is made upon unsurveyed lands, the grant to such Indians shall be adjusted upon the survey of the lands so as to conform thereto; and patents shall be issued to them for such lands in the manner and with the restrictions as herein provided. . . ."

Section 5 reads:

"That upon the approval of the allotments provided for in this act by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the State or Territory where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever; *Provided*, That the President of the United States may in any case in his discretion extend the period. And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same, before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void. . . ."

Section 6 is as follows:

"That upon the completion of said allotments and the patenting of the lands to said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside; and no Territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law. And every Indian born within the territorial limits of the United States to whom allotments shall have been made under the provisions of this act, or under any law or treaty, and every Indian born within the territorial limits of the United States who has voluntarily taken up, within said limits, his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States without in any manmer impairing or otherwise affecting the right of any such Indian to tribal or other property."

*Mr. A. E. Crane* for petitioner:

The act of February 8, 1887, has been construed by state courts and allottee Indians held to be citizens. They become citizens on the allotment and not twenty-five years later. *State* v. *Denoyer,* 72 N. W. Rep. 1015; *State* v. *Morris,* 55 N. W. Rep. 1086; *Wa La &c.* v. *Carter,* 53 Pac. Rep. 106; *United States* v. *Rickert,* 106 Fed. Rep. 5; *In re Now Ge Zhuck,* 76 Pac. Rep. 877. And see *Boyd* v. *Nebraska,* 143 U. S. 162; *Draper* v. *United States,* 164 U. S. 240, 246; *United States* v. *Kopp,* 110 Fed. Rep. 160, 166.

A citizen is one who owes the Government allegiance, service and money by way of taxation, and to whom the Government in turn grants and guarantees liberty of person and conscience, the right of acquiring and possessing property, of marriage

and the social relations of suit and defense, and security in person, estate and reputation. *United States* v. *Cruikshank*, 92 U. S. 542; *Dred Scott* v. *Sandford*, 19 How. 476; *Lyons* v. *Cunningham*, 14 Pac. Rep. 938; *Blank* v. *Pausch*, 113 Illinois, 60.

At the time of the sale of intoxicating liquor to him petitioner was a citizen of the State of Kansas and subject to its laws both civil and criminal and owing allegiance to the State, which was bound to protect him in his rights as such citizen; and in so doing the State would have the right to legislate concerning the sale of intoxicating liquor to him. *People* v. *Bray*, 38 Pac. Rep. 731. If the State has the right to legislate concerning such matters, it cannot belong to the Federal Government. *United States* v. *Ward*, 1 Kansas, 604; *State* v. *Campbell*, 55 N. W. Rep. 553; *The Kansas Indians*, 5 Wall. 737.

Citizenship is not affected by tribal relations. *French* v. *French*, 52 S. W. Rep. 517; *Raymond* v. *Raymond*, 83 ,Fed. Rep. 723; *United States* v. *Rogers*, 4 How. 567.

When an Indian becomes a citizen of the United States, he also becomes a citizen of the State wherein he resides. *People* v. *Bray*, 38 Pac. Rep. 732; *Beck* v. *Flourney Co.*, 65 Fed. Rep. 35; *Keokuk* v. *Ulam*, 38 Pac. Rep. 1080; *United States* v. *Hadley*, 99 Fed. Rep. 437; *Ells* v. *Ross*, 64 Fed. Rep. 417; *Gassies* v. *Ballon*, 6 Peters, 761. And is subject to its laws both civil and criminal. Congress only has power to regulate commerce of a tribe of Indians who maintain their tribal relations and while they are in a condition to determine for themselves with whom they will have commerce, or are in a condition to have Congress determine it for them. As to the status of an Indian who is subject to the jurisdiction and control of Congress see *United States* v. *Kagama*, 118 U. S. 375; *State* v. *Williams*, 43 Pac. Rep. 15; *People* v. *Ketchem*, 15 Pac. Rep. 353; *State* v. *Newell*, 24 Atl. Rep. 943; *Stevens* v. *Thatcher*, 39 Atl. Rep. 282; *United States* v. *Hershman*, 53 Fed. Rep. 543; act of March 3, 1871, now § 2079, Rev. Stat.; act of March 3, 1885. *Farrell* v. *United States*, 110 Fed. Rep. 942, cannot be sustained. The act of February 8, 1887, makes all allottee

Indians citizens without qualifications, and Kansas, and it alone, can regulate the sale of liquor to citizens of the State and to Indians. Congress cannot make police regulations affecting citizens of States. State v. Wise, 72 N. W. Rep. 843; State v. Lee, 38 S. W. Rep. 583; Breechbill v. Randall, 1 N. E. Rep. 362; New v. Walker, 108 Indiana, 365; W. U. Tel. Co. v. Pendleton, 95 Indiana, 12; Hockett v. State, 5 N. E. Rep. 181; Board of Excise v. Barrie, 34 N. Y. 666; Cooley on Const. Lim., § 572; United States v. DeWitt, 9 Wall. 41; License Tax Cases, 5 Wall. 462, 475; Slaughter House Cases, 16 Wall. 36. Indians can be citizens as to their personal rights and obligations and yet the Government can control their land under the act of 1887. United States v. Rickert, 188 U. S. 432; 15 Am. & Eng. Ency. Law, 2d ed., 20.

The Solicitor General for the United States:

Indian allottees, under the act of 1887, are not citizens at all until the issue of the patent in fee. The "first patent," so-called, does not confer citizenship of the United States or invoke state laws for their benefit and government. The allotment is not completed nor the lands patented within the meaning of sections 5 and 6 of the act until the final grant free of trust or incumbrance. The act of 1897 must be taken as a legislative interpretation of the act of 1887; the matter being political and for the determination of Congress, the courts will follow the construction by Congress; a fortiori, when a different construction would render the later act unconstitutional. Johnson v. Southern Pacific Company, 196 U. S. 1.

As to suspension of the citizenship privilege until issue of final patent see Kickapoo treaty of 1862, which provided (Arts. 2, 3) for preliminary certificates and for ultimate conveyance in fee and citizenship when it was duly determined that allottees were sufficiently intelligent and prudent to control their own affairs.

Even if qualified citizenship attaches upon the issue of the preliminary patent, the Government nevertheless possesses

authority to regulate liquor traffic with Indian allottees. The fundamental Federal power of dealing with Indians and controlling trade with them is broad and absolute, affecting individuals as well as tribes, especially so long as the tribal organization exists. *United States* v. *Kagama*, 118 U. S. 375; *United States* v. *Holliday*, 3 Wall. 407; *United States* v. *43 Gallons of Whiskey*, 93 U. S. 188.

The tribal relations of Indian allottees are not affected by the act of 1887. Section 10, Indian Appropriation Act of March 2, 1895, 23 Stat. 876; § 5, act of February 28, 1899, 30 Stat. 909; Reports Interior Dept. for 1902, pt. 1, p. 217; for 1903, pt. 1, p. 182; act of March 3, 1903, § 7, 32 Stat. 982, 1007. The treaties with the Kickapoos preserved the tribal organization, and the later policy of dealing with them by statute continues that status.

The qualified citizenship and subjection to state laws is not inconsistent with the power of Congress to regulate commerce. The state cases upon which petitioner relies recognize that fact. *State* v. *Campbell*, 53 Minnesota, 354. *United States* v. *Ward*, McCahon's Rep. 199, distinguished, and see *United States* v. *McBratney*, 104 U. S. 621; *Draper* v. *United States*, 164 U. S. 240.

Ordinarily, a Territory has general jurisdiction over an Indian reservation, but only in matters not interfering with the Federal protection of the Indians in accordance with treaty stipulations. *Utah Northern Ry. Co.* v. *Fisher*, 116 U. S. 28. Accordingly, many of the state cases cited by petitioner hold that an Indian allottee may sue and be sued in the state courts; that he may be punished by the State for an offense committed against the State; that if the State confers its citizenship and the right of suffrage upon him, he may vote at state elections.

There is no conflict of jurisdiction here, and the case does not really call for an examination of the meaning of the privileges and liabilities under the State created by the act of 1887. The Indian is not invoking a state law, nor complaining of one, nor is he charged with violation of a state law.

It is not necessary to view the act of 1897 as a repeal *pro tanto* of the act of 1887, but it is certainly true that any jurisdiction that the States may have over the Indians, being derived from Congress, is subject to alteration and repeal by Congress, and the intention of the act of 1897 is manifest. The citizenship of Indian allottees is not inconsistent with the guardianship of Congress. The act of 1887 itself contemplates further Federal control, and this policy is carried out by later acts, *e. g.*, act of February 28, 1891, 26 Stat. 794; act of March 3, 1891, 26 Stat. 987; act of May 31, 1900, 31 Stat. 221; 33 Stat. 213. This guardianship of the United States has been recently recognized. *Cherokee Nation* v. *Hitchcock*, 187 U. S. 308; *Lone Wolf* v. *Hitchcock*, 187 U. S. 567. *United States* v. *Rickert*, 188 U. S. 432, 437. *Farrell* v. *United States*, 110 Fed. Rep. 942, precisely rules the controversy. The act of 1887 did not change the status of Indian allottees as wards of the Government. *Ells* v. *Ross*, 64 Fed. Rep. 417; *United States* v. *Logan*, 105 Fed. Rep. 240; *United States* v. *Flournoy Live Stock &c. Co.*, 69 Fed. Rep. 886; *United States* v. *Mullin*, 71 Fed. Rep. 682; *United States* v. *Belt*, 128 Fed. Rep. 168; *United States* v. *Kiya*, 126 Fed. Rep. 879; *In re Lincoln*, 129 Fed. Rep. 247; *Mulligan* v. *United States*, 120 Fed. Rep. 98.

The continuance of the relation as wards relates both to property and to personal protection. The personal protection is at least as important, and the time of all others when Indians need this protection is when they are taking their first tentative steps as citizens. The right to buy or sell liquor is not an inherent or fundamental right; it is not a privilege or immunity of a citizen of a State or of a citizen of the United States. *Crowley* v. *Christensen*, 137 U. S. 86; *Farrell* v. *United States, ut supra.*

The power of the Federal Government to protect the Indians is not dependent upon the preservation of tribal relations.

From the adoption of the Constitution the Indians have been under the exclusive control of the nation, and the States are

without authority to extend their laws over the tribes residing within their limits. Authorities *supra*, and *Worcester* v. *Georgia*, 6 Pet. 565; *Fellows* v. *Blacksmith*, 19 How. 366; *Cherokee Nation* v. *Southern Kansas Ry. Co.*, 135 U. S. 641, 653; *Stevens* v. *Cherokee Nation*, 174 U. S. 445, 484; *Renfrow* v. *United States*, 3 Oklahoma, 166; § 2139, Rev. Stat.

If these Indians are citizens at all, they are not citizens of full competence, just as minors are citizens and subject to rights and duties as such, but are not *sui juris* in respect of age, and other classes of citizens under personal or legal disabilities are not *sui juris* in other respects. *United States* v. *Ritchie*, 17 How. 525, 540.

Mr. Justice Brewer, after making the foregoing statement, delivered the opinion of the court.

The contention of petitioner is that the act of January 30, 1897, is unconstitutional as applied to the sales of liquor to an Indian who has received an allotment and patent of land under the provisions of the act of February 8, 1887, because it is provided in said act that each and every Indian to whom allotments have been made shall be subject to the laws, both civil and criminal, of the State in which they may reside, and further that John Butler, having, as is admitted, received an allotment of land in severalty and his patent therefor under the provisions of the act of Congress of February 8, 1887, is no longer a ward of the Government, but a citizen of the United States and of the State of Kansas, and subject to the laws, both civil and criminal, of said State.

The relation between the Government and the Indians and the rights and obligations consequent thereon have been the subject of frequent consideration by this court. Among the recent cases, in which are found references to many prior adjudications, may be mentioned *Stephens* v. *Cherokee Nation*, 174 U. S. 445; *Minnesota* v. *Hitchcock*, 185 U. S. 373; *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294; *Lone Wolf* v. *Hitchcock*, 187 U. S. 553, and *United States* v. *Rickert*, 188 U. S. 432. In

a general way it may be said that the recognized relation between the Government and the Indians is that of a superior and an inferior, whereby the latter is placed under the care and control of the former. *Choctaw Nation* v. *United States*, 119 U. S. 1, 28. In the early dealings of the Government with the Indian tribes the latter were recognized as possessing some of the attributes of nations, with which the former made treaties, and the policy of the Government was, sometimes by treaties and sometimes by the use of force, to put a stop to the wanderings of these tribes and locate them on some definite territory or reservation, there establishing for them a communal or tribal life. While this policy was in force, and this location of wandering tribes was being accomplished, much of the legislation of Congress ran in the direction of the isolation of the Indians, preventing general intercourse between them and their white neighbors in order that they might not be defrauded or wronged through the superior cunning and skill of those neighbors. The practice of dealing with the Indian tribes as separate nations was changed by a proviso inserted in the Indian appropriation act of March 3, 1871 (16 Stat. 566; carried into section 2079 Rev. Stat.), which reads: "No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty." From that time on the Indian tribes and the individual members thereof have been subjected to the direct legislation of Congress which, for some time thereafter, continued the policy of locating the tribes on separate reservations and perpetuating the communal or tribal life.

While during these years the exercise of certain powers by the Indian tribes was recognized, yet their subjection to the full control of the United States was often affirmed. In *Lone Wolf* v. *Hitchcock*, 187 U. S. 565, it was said: "Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the

judicial department of the Government." And the conclusion thus reached was supported by the authority of several cases. It is true we ruled, when treaties between the Indian tribes and the United States were the subject of consideration, that "how the words of the treaty were understood by this unlettered people, rather than their critical meaning, should form the rule of construction." *Worcester* v. *Georgia*, 6 Pet. 515, 582. And we also said that the obligations which the United States were under to the Indians called for "such an interpretation of their acts and promises as justice and reason demand in all cases where power is exerted by the strong over those to whom they owe care and protection." *Choctaw Nation* v. *United States*, 119 U. S. 1, 28. But none of the decisions affirming the protection of the Indians questioned the full power of the Government to legislate in respect to them.

Of late years a new policy has found expression in the legislation of Congress—a policy which looks to the breaking up of tribal relations, the establishing of the separate Indians in individual homes, free from national guardianship and charged with all the rights and obligations of citizens of the United States. Of the power of the Government to carry out this policy there can be no doubt. It is under no constitutional obligation to perpetually continue the relationship of guardian and ward. It may at any time abandon its guardianship and leave the ward to assume and be subject to all the privileges and burdens of one *sui juris*. And it is for Congress to determine when and how that relationship of guardianship shall be abandoned. It is not within the power of the courts to overrule the judgment of Congress. It is true there may be a presumption that no radical departure is intended, and courts may wisely insist that the purpose of Congress be made clear by its legislation, but when that purpose is made clear the question is at an end.

It may be well to notice some of the legislation of Congress having this end in view. Section 15 of the act of March 3, 1893, 27 Stat. 612, 645, reads:

"The consent of the United States is hereby given to the allotment of lands in severalty not exceeding one hundred and sixty acres to any one individual within the limits of the country occupied by the Cherokees, Creeks, Choctaws, Chickasaws, and Seminoles; and upon such allotments the individuals to whom the same may be allotted shall be deemed to be in all respects citizens of the United States. And the sum of twenty-five thousand dollars, or so much thereof as may be necessary, is hereby appropriated to pay for the survey of any such lands as may be allotted by any of said tribes of Indians to individual members of said tribes; and upon the allotment of the lands held by said tribes respectively, the reversionary interest of the United States therein shall be relinquished and shall cease."

Section 16 created what is known as the Dawes Commission, for extinguishing the national or tribal title to lands within the Indian Territory. Pursuant to its authority an agreement was made with the Choctaw and Chickasaw Nations, for the allotment of their lands among the members, which agreement was ratified and approved by the act of Congress of June 28, 1898. 30 Stat. 495. In that agreement it was stipulated (p. 513): "It is further agreed that the Choctaws and Chickasaws, when their tribal governments cease, shall become possessed of all the rights and privileges of citizens of the United States." By the same act an agreement made with the Creek Indians, which contained a similar stipulation, was ratified and approved. In the last treaty with the Kickapoos, to which tribe John Butler, the person to whom the petitioner is charged to have sold the liquor, belonged, a treaty concluded June 28, 1862 (Revision of Indian Treaties, Art. 8, p. 449), it was provided:

"ART. 3. At any time hereafter, when the President of the United States shall have become satisfied that any adults, being males and heads of families, who may be allottees under the provision of the foregoing article, are sufficiently intelligent and prudent to control their affairs and interests, he may, at

the requests of such persons, cause the land severally held by them to be conveyed to them by patent in fee simple, with power of alienation; and may, at the same time, cause to be set apart and placed to their credit severally, their proportion of the cash value of the credits of the tribe, principal and interest, then held in trust by the United States, and also, as the same may be received, their proportion of the proceeds of the sale of lands under the provisions of this treaty. And on such patents being issued, and such payments ordered to be made by the President, such competent persons shall cease to be members of said tribe, and shall become citizens of the United States; and thereafter the lands so patented to them shall be subject to levy, taxation, and sale, in like manner with the property of other citizens: *Provided,* That before making any such application to the President, they shall appear in open court, in the District Court of the United States for the District of Kansas, and make the same proof and take the same oath of allegiance as is provided by law for the naturalization of aliens; and shall also make proof, to the satisfaction of said court, that they are sufficiently intelligent and prudent to control their affairs and interests; that they have adopted the habits of civilized life, and have been able to support, for at least five years, themselves and families."

A similar clause is found in the treaty of April 19, 1862, between the United States and the Pottawatomie Indians. (Revision of Indian Treaties, 683, 685.) It was not uncommon in the District Court of the United States for the District of Kansas, in the years following these treaties, to see Indians coming into the District Court and taking the oath of allegiance, as required by these provisions. We make these references to recent treaties, not with a view of determining the rights created thereby, but simply as illustrative of the proposition that the policy of the Government has changed, and that an effort is being made to relieve some of the Indians from their tutelage and endow them with the full rights of citizenship, thus terminating between them and the Government the

relation of guardian and ward, and that the statute we are considering is not altogether novel in the history of Congressional legislation.

Now the act of 1887 was passed twenty-five years after the treaty of 1862 with the Kickapoos, and must be construed in the light of that treaty. By the treaty it was declared that at the instance of the President, and upon compliance with specified provisions, certain of the Indians should be considered as competent persons, should cease to be members of the tribe and become citizens of the United States. The act of 1887, in like manner, provides that at the instance of the President, a reservation may be surveyed and individual tracts allotted to the Indians, and that upon approval of the allotments by the Secretary of the Interior patents shall issue, subject to a condition against alienation and incumbrances during a period of twenty-five years, or longer, if the President deems it wise. Section 6 then declares that the "Indians to whom allotments shall have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside, and no Territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law."

It is urged that this clause becomes operative only when the final patent provided for by section 5 is issued, but there are many reasons why such contention is unsound. In the first place, it is hardly to be supposed that Congress would legislate twenty-five years in advance in respect to the general status of these Indians. If they were to continue in the same relation to the Government that they hitherto occupied, it would seem as though Congress would have said nothing and waited until near the expiration of twenty-five years before determining what should be such status. Second, the language of the first sentence of section 6 forbids the construction contended for. It is "that upon the completion of said allotments and the patenting of the lands to said allottees." Now the allotting and the patenting are joined together as though oc-

curring at or near the same time. Further, when the first patent is issued, the recipient ceases to be an allottee and becomes a patentee. Again, the second patent does not always go to the holder of the first patent because, as provided by section 5, it may go to the first patentee or his heirs. And finally, the last sentence indicates that the whole section deals with present conditions and present rights. It reads: "And every Indian born within the territorial limits of the United States to whom allotments shall have been made under the provisions of this act . . . is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, . . . without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property." This confers citizenship upon the allottee and not upon the patentee, while at the same time securing to him his right to tribal or other property. So far as his political status is concerned the allottee is declared to be a citizen—not that he will be a citizen after twenty-five years have passed and a second patent shall have been issued. That citizenship is limited to the allottees born within the territorial limits of the United States was obviously intended to exclude from that privilege such allottees, if any there should be, who had recently come into this country from the Dominion of Canada or elsewhere.

This question has been presented to several state and some Federal courts, and the ruling universally has been to the same effect. State ex rel. v. Denoyer, 6 N. Dak. 586; State ex rel. v. Norris, 37 Nebraska, 299; Wa-La-Note-Tke-Tynin v. Carter, 6 Idaho, 85; In re Now-Ge-Zhuck, 76 Pac. Rep. 877; United States v. Rickert, 106 Fed. Rep. 1, 5; Farrell v. United States, 110 Fed. Rep. 942, 947. In the first of these cases this declaration is made: "Such Indians and persons of Indian descent, so residing upon lands allotted to them in severalty, and upon which the preliminary patents have been issued, are citizens of the United States, and qualified electors of this State." See also Boyd v. Thayer, 143 U. S. 135, 162, in which it is said:

"The act of Congress approved February 8, 1887, 24 Stat. 388, was much broader, and by its terms made every Indian situated as therein referred to, a citizen of the United States."

In reference to this matter the learned Solicitor General makes these observations:

"Were it not for the fact that every court that has considered this language at all has assumed it to mean that an Indian becomes entitled to the benefit of and subject to the laws of the State in which he resides upon the receipt of his first patent, the natural inference would be that Congress intended those consequences to attach only when the allotments referred to had been fully completed and final patent issued. But in spite of the array of cases upon this subject, it will be found, upon examination, that in none of them was the provision referred to carefully analyzed and discussed, and that from first to last it has been merely a matter of assumption.

"Upon the subject of citizenship, section 6 provides that 'every Indian born within the territorial limits of the United States to whom allotments shall have been made under the provisions of this act or under any law or treaty, . . . is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens.'

"It would seem that Congress intended citizenship of the United States to attach at the same time that the Indian becomes subject to the laws of the State or Territory in which he resides. As a matter of constitutional law, an Indian appears to be entitled to the benefit of and to be subject to the laws of the State in which he resides the moment he becomes a citizen of the United States. By virtue of the Fourteenth Amendment a citizen of the United States becomes, by residence therein, a citizen of the State, and entitled to all the rights, privileges, and immunities of other citizens of the State and to the equal protection of its laws. *The Slaughter House Cases*, 16 Wall. 36."

We do not doubt that the construction placed by these several courts upon this section is correct, and that John Butler, at the time the defendant sold him the liquor, was a citizen of the United States and of the State of Kansas, having the benefit of and being subject to the laws, both civil and criminal, of that State. Under these circumstances could the conviction of the petitioner in the Federal court of a violation of the act of Congress of January 30, 1897, be sustained? In this Republic there is a dual system of government, National and state. Each within its own domain is supreme, and one of the chief functions of this court is to preserve the balance between them, protecting each in the powers it possesses and preventing any trespass thereon by the other. The general police power is reserved to the States, subject, however, to the limitation that in its exercise the State may not trespass upon the rights and powers vested in the General Government. The regulation of the sale of intoxicating liquors is one of the most common and significant exercises of the police power. And so far as it is an exercise of the police power it is within the domain of state jurisdiction. It is true the National Government exacts licenses as a condition of the sale of intoxicating liquors, but that is solely for the purposes of revenue and is no attempted exercise of the police power. A license from the United States does not give the licensee authority to sell liquor in a State whose laws forbid its sale, and neither does a license from a State to sell liquor enable the licensee to sell without paying the tax and obtaining the license required by the Federal statute. *License Cases*, 5 How. 504; *McGuire* v. *The Commonwealth*, 3 Wall. 387; *License Tax Cases*, 5 Wall. 462. Now the act of 1897 is not a revenue statute, but plainly a police regulation. It will not be doubted that an act of Congress attempting as a police regulation to punish the sale of liquor by one citizen of a State to another within the territorial limits of that State would be an invasion of the State's jurisdiction and could not be sustained, and it would be immaterial what the antecedent status of either buyer or seller

was. There is in these police matters no such thing as a divided sovereignty. Jurisdiction is vested entirely in either the State or the Nation and not divided between the two.

In *The Kansas Indians*, 5 Wall. 737, the question was whether lands of Shawnee Indians held in severalty were subject to state taxation, and it was held that they were not, although in the last treaty with the Shawnees, the one authorizing the allotments, there was no express stipulation for exemption from taxation. The court said (p. 755):

"If the tribal organization of the Shawnees is preserved intact, and recognized by the political department of the Government as existing, then they are a 'people distinct from others,' capable of making treaties, separated from the jurisdiction of Kansas, and to be governed exclusively by the government of the Union. If under the control of Congress, from necessity there can be no divided authority. If they have outlived many things, they have not outlived the protection afforded by the Constitution, treaties, and laws of Congress. It may be that they cannot exist much longer as a distinct people in the presence of the civilization of Kansas, 'but until they are clothed with the rights and bound to all the duties of citizens,' they enjoy the privilege of total immunity from state taxation."

If it be true that there can be no divided authority over the property of the Indian, *a fortiori* must it be true as to his political status and rights.

Subjection to both state and National law in the same matter might often be impossible. The power to punish a sale to an Indian implies an equal power to punish a sale by an Indian. If by National law a sale to or by an Indian was punished solely by imprisonment and by state law solely by fine, how could both laws be enforced in respect to the same sale? The question is not whether a particular right may be enforced in either a court of the State or one of the Nation, but whether two sovereignties can create independent duties and compel obedience. In *United States* v. *Dewitt*, 9 Wall. 41, the

question was whether the twenty-ninth section of the internal revenue act of March 2, 1867, 14 Stat. 471, 484, which established a police regulation in, respect to the mixing for sale or the selling of naphtha and illuminating oils was enforcible within the limits of a State, and it was held that it was not, the court saying (p. 45):

"As a police regulation, relating exclusively to the internal trade of the States, it can only have effect where the legislative authority of Congress excludes, territorially, all state legislation, as for example, in the District of Columbia. Within state limits, it can have no constitutional operation."

*In re Now-Ge-Zhuck*, 76 Pac. Rep. 877, decided by the Supreme Court of Kansas, referred to an allottee under the act of February 8, 1887, and in respect to the power of the State to enforce its laws over such allottee that court said:

"An Indian upon whom has been conferred citizenship, and who enjoys the protection of the laws of the State, should be punished for a transgression of them. This we are to presume Congress contemplated. It being shown by the agreed facts that the petitioner was an allottee to whom a patent had been issued, and further shown that the allotments had been made and completed as provided by the act of February 8, 1887, the laws of the State were operative, and the State had jurisdiction to arrest and punish petitioner for the offense by him committed."

It is true the same act may often be a violation of both the state and Federal law, but it is only when those laws occupy different planes. Thus, a sale of liquor may be a violation of both the state and Federal law, in that it was made by one who had not paid the revenue tax, and received from the United States a license to sell, and also had not complied with the state law in reference to the matter of state license. But in that case the two laws occupy different planes—one that of revenue and the other that of police regulation. There is no suggestion in the present case of a violation of the internal revenue law of the Nation, but the conviction is sought to be

upheld under the act of 1897, a mere statute of police regulation.

But it is contended that although the United States may not punish under the police power the sale of liquor within a State by one citizen to another it has power to punish such sale if the purchaser is an Indian.   And the power to do this is traced to that clause of section 8, Art. I, of the Constitution, which empowers Congress "to regulate commerce with foreign nations, and among the several States, and with the Indian tribes."   It is said that commerce with the Indian tribes includes commerce with the members thereof, and Congress having power to regulate commerce between the white men and the Indians continues to retain that power, although it has provided that the Indian shall have the benefit of and be subject to the civil and criminal laws of the State and shall be a citizen of the United States, and therefore a citizen of the State.   But the logic of this argument implies that the United States can never release itself from the obligation of guardianship; that so long as an individual is an Indian by descent, Congress, although it may have granted all the rights and privileges of National and therefore state citizenship, the benefits and burdens of the laws of the State, may at any time repudiate this action and reassume its guardianship, and prevent the Indian from enjoying the benefit of the laws of the State, and release him from obligations of obedience thereto. Can it be that because one has Indian, and only Indian blood in his veins, he is to be forever one of a special class over whom the General Government may in its discretion assume the rights of guardianship which it has once abandoned, and this whether the State or the individual himself consents?   We think the reach to which this argument goes demonstrates that it is unsound.

But it is said that the Government has provided that the Indians' title shall not be alienated or encumbered for twenty-five years, and has also stipulated that the grant of citizenship shall not deprive the Indian of his interest in tribal or other

property, but these are mere property rights and do not affect the civil or political status of the allottees. In *United States* v. *Rickert*, 188. U. S. 432, we sustained the right of the Government to protect the lands thus allotted and patented from any encumbrance of state taxation. Undoubtedly an allottee can enforce his right to an interest in the tribal or other property (for that right is expressly granted) and equally clear is it that Congress may enforce and protect any condition which it attaches to any of its grants. This it may do by appropriate proceedings in either a National or a state court. But the fact that property is held subject to a condition against alienation does not affect the civil or political status of the holder of the title. Many a tract of land is conveyed with conditions subsequent. A minor may not alienate his lands; and the proper tribunal may at the instance of the rightful party enforce all restraints upon alienation.

But it is unnecessary to pursue this discussion further. We are of the opinion that when the United States grants the privileges of citizenship to an Indian, gives to him the benefit of and requires him to be subject to the laws, both civil and criminal, of the State, it places him outside the reach of police regulations on the part of Congress; that the emancipation from Federal control thus created cannot be set aside at the instance of the Government without the consent of the individual Indian and the State, and that this emancipation from Federal control is not affected by the fact that the lands it has granted to the Indian are granted subject to a condition against alienation and encumbrance, or the further fact that it guarantees to him an interest in tribal or other property.

The District Court of Kansas did not have jurisdiction of the offense charged, and therefore the petitioner is entitled to his discharge from imprisonment.

Mr. Justice Harlan dissented.