Tomkins, Respondent, vs. Campbell, Appellant.

*May 10—June 21, 1906.*

*Indians: Sale of timber from allotted lands: Assignment of proceeds.*

The patent of lands allotted to an Indian pursuant to the treaty of September 30, 1854, provided that he should not alienate them in any manner without the consent of the President. Rules approved by the President provided that the net proceeds of timber sold from such lands should be deposited in some national bank subject to check of the Indian owner, countersigned by the United States Indian agent. A contract, made under said rules, for the sale of timber from the allotted lands provided for

payment of the purchase price to the Indian agent in trust for the owner. *Held* that, although the Indian owner had by the act of Congress of February 8, 1887, become a citizen of the United States and emancipated from federal control, his power to dispose of the proceeds of the timber was still subject to the approval of the Indian agent, and hence that an assignment thereof without such approval was invalid.

APPEAL from an order of the circuit court for Ashland ·county: JOHN K. PARISH, Circuit Judge. *Reversed.*

This is an appeal from an order overruling a general demurrer to the plaintiff's complaint. The complaint alleges, in substance, that one Antoine Sailor is an Indian of the Bad River reservation, born within the jurisdiction of the United States, and that defendant *Campbell* is the Indian agent of the La Pointe Indian agency; that a treaty was made with the Chippewa Indians of Lake Superior and the Mississippi September 30, 1854, of which the third article is as follows:

"Article Three. The United States' will define the boundaries of the reserved tracts, whenever it may be necessary, by actual survey, and the President may, from time to time, at his discretion, cause the whole to be surveyed, and may assign to each head of a family, or a single person over twenty-one years of age, eighty acres of land for his or their separate use; and he may, at his discretion, as fast as the occupants become capable of transacting their own affairs, issue patents therefor to such occupants, with such restrictions of the power of alienation as he may see fit to impose. And he may also, at his discretion, make rules and regulations respecting the disposition of the lands in case of the death of the head of a family or single person occupying the same, or in case of its abandonment by them. And he may also assign other lands in exchange for mineral lands, if any such are found in the tracts herein set apart. And he may also make such changes in the boundaries of such reserved tracts or otherwise as shall be necessary to prevent interference with any vested rights. All necessary roads, highways, and railroads, the lines of which may run through any of the reserved tracts, shall have the right of way through the same, compensation being made therefor as in other cases."

The complaint further alleges that, in accordance with the terms of this treaty, the President of the United States, on May 31, 1898, approved the selection by said Sailor of two forty-acre tracts of land on the Bad River reservation, and on August 29th issued and delivered to said Sailor a patent covering said tracts, which contained the proviso that neither said Sailor nor his heirs should sell, lease, or in any manner alienate said tract without the consent of the President of the United States; that on March 31, 1899, said Sailor, with the consent of the President, sold the merchantable timber upon his said allotted lands to one Stearns, under a written contract by the terms of which Stearns agreed to pay certain prices per thousand for said timber "to the United States Indian agent for the La Pointe agency, in trust for the said Sailor;" that Stearns immediately commenced to cut and remove said timber, and that there is now in possession of said Indian agent the sum of $878.83, received by him from said Stearns for such timber, in trust for said Sailor; that on the 30th day of June, 1905, said Sailor, for a valuable consideration, assigned said amount so due him from said agent, by an instrument in writing, to the plaintiff, and directed that the same be paid to the plaintiff, and that plaintiff has demanded payment of said sum to him, but the defendant has refused and still refuses to pay the same, and refuses to deposit the same in bank or countersign Sailor's check therefor, and refuses to pay said sum to Sailor or his assigns, except in monthly payments of $10 each.    Certain rules and regulations approved by the President December 6, 1893, under which the timber contract with Stearns was made, are attached to the complaint, among which is the following rule:

"After deducting one half of the cost of the scaling and other necessary expenses chargeable against the same, the proceeds of timber sold from the unallotted portion of the reservation shall be paid to the Indian agent, to be expended for the relief and benefit of the Indians of the reservation under the direction of the commissioner of Indian affairs; and the

proceeds of timber taken from the allotted lands of the reservation shall, after the deductions above stated, be deposited in some national bank subject to check of the Indian owner of the allotment, countersigned by the Indian agent of the La Pointe agency, unless otherwise stipulated in contracts with particular Indians."

For the appellant there was a brief by *William G. Wheeler* and *Henry H. Morgan,* and oral argument by *Mr. Wheeler.*

For the respondent there were briefs by *Tomkins, Tomkins & Garvin,* and oral argument by *W. M. Tomkins.*

WINSLOW, J.   The simple question presented is whether Sailor has absolute control and power of disposition over the money received by the Indian agent in payment for the timber cut from Sailor's allotment of land, or whether his power of disposition is limited and subject to the approval of the Indian agent.   The plaintiff's claim is that, because by the terms of the so-called Dawes act of Congress of February 8, 1887 (24 U. S. Stats. at Large, 388, ch. 119), Sailor had become a citizen of the United States and was emancipated from federal control (*In re Heff,* 197 U. S. 488, 25 Sup. Ct. 506), he is necessarily entitled to the full management and control of the proceeds of the timber cut from his lands.   Being so emancipated, the argument is that the provision of the rules which requires that the proceeds of the timber be deposited in a bank subject to his check countersigned by the Indian agent means that he has absolute control of the deposit; that the signature of the Indian agent is only required as a means of identification and must be appended by the agent whenever a proper check is presented.   While it must be admitted that the Indian allottee under the circumstances stated has become a citizen, it does not follow therefrom that the government has thereby thrown aside all the barriers and restrictions which it had so carefully erected to protect him from his natural improvidence.   Notwithstanding he was a citizen, the government in dealing with him and granting him

Tomkins v. Campbell, 129 Wis. 93.

rights of property could, if it chose, surround those rights with safeguards or limitations intended for his own welfare and to prevent his squandering his property. The treaty of 1854 clearly contemplates that his ownership of land shall be subject to substantial restrictions upon the right of alienation, and these restrictions were carried into the patent issued long after the passage of the Dawes act, by provisions which deprived him of the power of alienation in any manner without the consent of the President. These restrictions upon alienation of the land, so industriously inserted in the patent, must be borne in mind when considering the intent of the government in its regulations as to the sale of the timber and the disposition of the proceeds. So, also, the pre-existing relations of guardianship which the government has always maintained toward the Indian must be kept in view.

In view of these considerations, what is the natural meaning of the provisions of the contract, that the money for the timber is to be paid to the Indian agent in trust for the Indian, and that it is to be deposited in bank by him subject to the check of the Indian countersigned by the agent? To our minds these provisions cannot be construed as meaning that the government intended to abolish the safeguards which it erected to guard against the Indian's improvidence, but rather that it intended to place the proceeds of the land practically in the same position as the land itself, namely, subject to disposition only by the Indian when such disposition is approved by the government acting through its Indian agent, instead of through the President. There is clearly no reason why the Indian should be prevented from selling or alienating his land, and should be given free disposal of the moneys arising from the sale of the timber thereon, which doubtless constituted the principal part of its value. On the contrary, there is every reason why there should be substantially the same restrictions upon the disposal of his money as upon the disposal of his land. In view of these considerations we find

no difficulty in construing the provisions of the contract and rules above referred to as meaning that the Indian's power of disposition of the money received from the sale of his timber is subject to the approval of the agent, and hence that the plaintiff cannot recover. The question seems to be a new one, and one not yet presented to the United States courts. So far as the subject has been approached, the decisions favor the construction we have adopted. *Hitchcock v. U. S.* 22 App. D. C. 275; *U. S. v. Thurston Co.* 143 Fed. 287.

*By the Court.*—Order reversed, and action remanded with directions to sustain the demurrer to the complaint.