---

UNITED STATES v. HALL et al.

(District Court, E. D. Wisconsin. July 1, 1909.)

1. INDIANS (§ 35*)—INTOXICATING LIQUORS—CARRYING INTO INDIAN RESERVATION—FEDERAL COURTS—JURISDICTION.

Act Feb. 8, 1887, c. 119, § 6, 24 Stat. 390, provides that any Indian who adopts the habits of civilized life may become a full citizen, and 24 Stat. 388, declares that every allottee shall be subject to the laws, criminal and civil, of the state or territory in which they may reside. *Held,* that where an Indian reservation had been broken up and a large part of it was owned in trust by allottees or white men, who had obtained title from the allottee's heirs at law, such allottees became citizens of the state, and were not therefore subject to prosecution in the federal courts for carrying ardent spirits into the reservation in violation of Act Cong. Jan. 30, 1897, c. 109, 29 Stat. 506; the regulation of the liquor traffic in so far as it affected such allottees being within the exclusive jurisdiction of the state.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 35.*]

2. GUARDIAN AND WARD (§ 1*)—"GUARDIANSHIP."

"Guardianship" is a trust which is dual in its nature involving two distinct and separate functions, viz., the control of the person of the ward and the management of his estate.

[Ed. Note.—For other cases, see Guardian and Ward, Cent. Dig. § 1; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 4, p. 3187.]

On Demurrer to Indictment.

The defendants, who are Oneida Indians, are indicted under the law of 1897 (Act Jan. 30, 1897, c. 109, 29 Stat. 506), for carrying ardent spirits into the Indian Reservation. A demurrer has been interposed to the indictment. The defendants are themselves allottees, to each of whom a tract of land has been allotted, and to whom has been given by the government what is known as a trust patent, whose terms and legal effect are discussed in several of the cases cited in the opinion. It is conceded in argument that a large fraction of the Oneida Reservation is now owned and occupied by white men who have obtained title through the heirs at law of deceased allottees pursuant to an

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

act of Congress. Act May 27, 1902, c. 888, 32 Stat. 245. It further appears by the statutes of the state that the former Oneida Reservation has been organized and divided into two townships—with provisions for local government.

H. K. Butterfield, U. S. Dist. Atty., and E. J. Henning, for the United States.

Kittell & Burke, for defendants.

QUARLES, District Judge (after stating the facts as above). The demurrer questions the jurisdiction of the government in the premises to enforce Act Jan. 30, 1897, c. 109, 29 Stat. 506. This is a serious and important question, which, for many reasons, ought to be speedily and finally settled.

The relation between the United States government and the Indians was settled by a learned and elaborate opinion by Mr. Justice Marshall in Cherokee Nation v. Georgia, 5 Pet. 1, 8 L. Ed. 25, which opinion has been followed in many later cases. The United States, as in duty bound, assumed guardianship over the Indians as a dependent and inferior race, and as such has exercised all the functions of guardianship over them. It assumed personal control, and directed tribes to move west of the Mississippi river when their hunting grounds were obstacles in the way of advancing civilization. It corralled them upon reservations. Congress legislated to protect the Indian against the wiles of the white man as well as against his own appetite. Stringent laws were passed prohibiting the introduction of ardent spirits into the Indian country. For many years the tribes were recognized as possessing certain qualified sovereignty and capable of making treaties. But as time progressed experience demonstrated that the tribal relation was an insuperable obstacle to civilization. In 1871 Congress passed an act, now found in the Revised Statutes as section 2079, whereby no Indian nation or tribe as such should thereafter be recognized by treaty or otherwise. But finally the great truth was made manifest to the Indian Bureau that in civilization, as in education or religion, the individual is the unit, and that it is hopeless to undertake to civilize a tribe as such; that public sentiment is as strong a factor among a band of Indians isolated on a reservation as in a white community; that the influence of the tepee was neutralizing the training of the school. Experience showed that a graduate of Carlyle or Hampton who returned to his tribe was compelled to go back to the blanket with all that this implies. Education and culture were not popular, and were treated with ridicule and contempt. The reservation impaired the strength and vigor of the race, but did not weaken its instincts and prejudices. Finally Congress came to the wise conclusion that, if the red men were to be civilized, they must be dealt with like other foreign elements, and assume the duties and responsibilities of citizenship. Whereupon it was provided that any Indian who adopts the habits of civilized life may become a full citizen. Act Feb. 8, 1887, c. 119, § 6, 24 Stat. 390. Thereupon Congress adopted the policy of breaking up reservations and allotting the territory to the individual members of the respective bands or tribes. In the enforcement of this policy Congress declared (24 Stat. 388) that each and every member of the respective bands or tribes to whom allotments have been made

shall have the benefit of and be subject to the laws, both civil and criminal, of the state or territory in which they may reside. This statute was construed by the Supreme Court in Re Heff, 197 U. S. 488, 499, 25 Sup. Ct. 506, 508, 49 L. Ed. 848. This case involved the supposed crime of selling liquor to an allottee outside the reservation. The Solicitor General argued that:

"The continuance of the relation as wards relates both to property and personal protection. The personal protection is at least as important, and the time of all others when Indians need this protection is when they are taking their first tentative steps as citizens."

The court held that the government was under no constitutional obligation to perpetually continue the relationship of guardian and ward; that it might at any time abandon its guardianship, and leave the ward to assume and be subject to all the privileges and burdens of one sui juris. At page 505 of 197 U. S., at page 510 of 25 Sup. Ct. (49 L. Ed. 848), the court say:

"The general police power is reserved to the states, subject, however, to the limitation that in its exercise the state may not trespass upon the rights and powers vested in the general government. The regulation of the sale of intoxicating liquors is one of the most common and significant exercises of the police power. And so far as it is an exercise of the police power it is within the domain of state jurisdiction."

At page 508 of 197 U. S., at page 512 of 25 Sup. Ct. (49 L. Ed. 848), the act of 1897 is designated as a mere statute of police regulation. At page 509 of 197 U. S., at page 512 of 25 Sup. Ct. (49 L. Ed. 848), the court further say:

"When the United States grants the privileges of citizenship to an Indian, it gives him the benefit of and requires him to be subject to the laws, both civil and criminal, of the state. It places him outside the reach of police regulations on the part of Congress. That the emancipation from federal control thus created cannot be set aside at the instance of the government without the consent of the individual Indian and the state," etc.

It is further held that two sovereignties cannot at the same time exercise the police power over a given territory.

The attention of the court was again called to the same subject in Dick v. United States, 208 U. S. 352, 28 Sup. Ct. 402, 52 L. Ed. 520, where the indictment was for introducing liquor into the Indian country. The court say:

"If this case depended alone upon the federal liquor statute forbidding the introduction of intoxicating drinks into the Indian country, we should feel obliged to adjudge that the trial court erred in not directing a verdict for the defendant; for that statute, when enacted, did not intend by the words 'Indian country' to embrace any body of territory in which at the time the Indian title had been extinguished, and over which, and over the inhabitants of which, the jurisdiction of the state for all purposes of government was full and complete."

The Dick Case was differentiated by the provision in a treaty which stipulated for the continuance of the jurisdiction and laws of the United States over the allotted territory. It would seem, therefore, that both features of the liquor law of 1897 have been considered as inapplicable to Indians who are allottees under the act of 1887. These cases would seem to rule the instant case.

To get a comprehensive view of the legal situation we must read United States v. McBratney, 104 U. S. 621, 26 L. Ed. 869, and Draper v. United States, 164 U. S. 240, 17 Sup. Ct. 107, 41 L. Ed. 419. These cases clearly recognize the exclusive jurisdiction of any state that is admitted upon an equal footing with other states to try and punish its own citizens for offenses committed upon a reservation, in the absence of any modifying clause in statute or treaty. This doctrine as to white citizens was clearly asserted by the Supreme Court of Wisconsin in State v. Doxtater, 47 Wis. 278, 2 N. W. 439, holding that, as there was no reservation of jurisdiction in the Wisconsin enabling act (Act Aug. 6, 1846, c. 89, 9 Stat. 56), the state jurisdiction over all its citizens whereever found is complete. In United States v. Kagama, 118 U. S. 381, 6 Sup. Ct. 1109, 30 L. Ed. 228, the court sustained the federal jurisdiction over an Indian who had committed the crime of murder upon a reservation located within a state pursuant to Act March 3, 1885, c. 341, § 9, 23 Stat. 362. On page 383 of 118 U. S. on page 114 of 6 Sup. Ct. (30 L. Ed. 228), the court say:

"These Indian tribes are the wards of the United States. They are communities dependent upon the United States. * * * They owe no allegiance to the states, and receive from them no protection."

This is the basic proposition upon which the decision rests. It is obvious that the later legislation of Congress providing for allotments and consequent citizenship has changed the attitude of the parties. The defendants, being allottees, are citizens of the state of Wisconsin to all intents and purposes, receiving protection from the laws of the state, and being amenable thereto. Here the color line fades out. While conceding that this prosecution cannot rest on the police power, it is, however, strenuously urged that another line of decisions of the Supreme Court give countenance to the present contention of the government. United States v. Rickert, 188 U. S. 437, 23 Sup. Ct. 478, 47 L. Ed. 532, is cited in this connection. The Ricker Case involved the protection of the lands of allottee Indians against the taxing power of the state. The fee title of such lands being in the government, they were held to be an instrumentality of the government to carry out the purposes of Congress, and were therefore beyond the taxing power of the state. It was a case of the guardian interposing to protect the property of his ward. Jourdan v. Barrett, 4 How. 168, 177, 11 L. Ed. 924, is also relied upon, which merely holds that the federal government has power to punish a trespass on government lands. See, also, United States v. Gardner, 133 Fed. 285, 66 C. C. A. 663. McKay v. Kalyton, 204 U. S. 458, 27 Sup. Ct. 346, 51 L. Ed. 566, emphasizes the supervisory control of the government over these allotted lands, and the court in that case expressly held that it was not in conflict with the doctrine of the Heff Case, supra. Camfield v. United States, 167 U. S. 518, 17 Sup. Ct. 864, 42 L. Ed. 260, merely elaborates the doctrine of the earlier cases, vindicating the power of Congress to pass regulations to control the conservation and management of these lands which the government holds for the benefit of its wards; and that such regulations may even savor of the police power, but the opinion expressly limits its scope and meaning by the clause "so long as such power is directed solely to its own protection." The argument of the

government ignores a fundamental distinction. Guardianship is a trust which is dual in its nature, involving two distinct and separable functions. One is the control of the person of the ward, the other the management of his estate. We have seen that it has been settled that the government may at any time terminate this relation of guardianship. It follows, therefore, it may at its pleasure emancipate the Indian from personal control, and still retain the other function of managing and conserving his property. That the emancipation of the Indian from further federal control was the purpose of Congress is so plain from the language employed in the act of 1887 that no argument could make it plainer. The purpose of the government to protect the title of allotted land has been declared with equal distinctness. To control the habits and restrain the passions of a people is the peculiar province of the police power. This jurisdiction has been distinctly renounced by the United States, and is now clearly vested in the states. To say that temperate habits and correct living by the inhabitants will enhance the value of government land, and that, therefore, federal jurisdiction may find in this fact a substantial basis within the territory formerly occupied as a reservation is far-fetched and illogical. It is contended that it is competent for the government to determine what shall constitute a trespass upon its lands. To say that an allottee when entering upon his own land becomes a trespasser thereon if he carries a pint bottle of whisky in his pocket is a confusion of ideas. A trespass upon lands is something so familiar and well-defined that it cannot be distorted to cover the misconduct charged against these defendants.

Furthermore, it is conceded in argument that a large fraction of the territory formerly known as the Oneida Reservation is owned and occupied by white men. It is conceded that the state has complete and exclusive jurisdiction over such white men. If the theory of the government here presented were to be adopted, we should have this anomalous situation: a quarter section occupied by a white man would be under the jurisdiction of the state, while the next quarter section, occupied by an allottee, would fall under the federal jurisdiction. There would be two rules of conduct, which might be entirely different, operating at the same time upon the same township, according to the complexion of the inhabitants. This amounts to a reductio ad absurdum. When understandingly read, there is no conflict in the federal decisions. The Indian allottees are citizens of the state of Wisconsin upon an even footing with all other citizens. It is the exclusive prerogative of the state to pass and enforce laws relating to the liquor traffic which is wholly separate and apart from the jurisdiction which the federal government retains to protect and regulate the alloted lands. This jurisdiction of the state extends to all its citizens without regard to color, race, or former condition. Under the legislation of Congress, the allottee has certain vested rights. The state has assumed a vested jurisdiction. In the Heff Case it is distinctly held that these vested rights "cannot be set aside at the instance of the government without the consent of the individual Indian and the states."

For these reasons, I feel constrained to hold that the demurrer should be sustained, and that the defendants should be discharged.