Katherine B. NICHOLS, Individually, and as Special Administratrix of the Estate of Amelia Huston Nichols No. 593, deceased, Plaintiff,

v.

Don RYSAVY, et al., Defendants.

Clover POTTER, Individually, and as Special Administratrix of the Estate of James Wilde, Plaintiff,

v.

STATE OF SOUTH DAKOTA, et al., Defendants.

Gladys ECOFFEY, Individually, and as Special Administratrix of the Estate of John Yellow Bird, Plaintiff,

v.

WASHABAUGH COUNTY, et al., Defendants.

Civ. Nos. 83–5002, 83–5033 and 83–5055.

United States District Court, D. South Dakota, W.D.

May 10, 1985.

Ramon A. Roubideaux, Rapid City, S.D., Mario Gonzalez, Pine Ridge, S.D., John T. Hughes, Sturgis, S.D., Kim Jerome Gottschalk, Jeanette Wolfley, Boulder, Colo., for plaintiffs.

William T. Finley, Jr., David F.B. Smith, Kevin W. McLean, Washington, D.C., amici curiae.

Tom D. Tobin, Winner, S.D., David Albert Mustone, Washington, D.C., for Leo Novotny.

John Simpson, Winner, S.D., for defendants Rysavy.

John P. Guhin, Asst. Atty. Gen., Pierre, S.D., for State of S.D.

Philip N. Hogen, U.S. Atty., Sioux Falls, S.D., and Kenneth A. Pels, Atty. U.S. Dept. of Justice, Washington, D.C., for U.S. defendants.

Tom Tobin and William W. Shakely, amici curiae, Bennett & Ziebach Cos.

Robert A. Sambroak, Jr., Kadoka, S.D., for Washabaugh County.

BOGUE, Chief Judge.

## STATEMENT OF THE CASE

These three cases were consolidated pursuant to F.R.C.P. 42(a) for the purpose of

determining motions to dismiss filed in each of the three forced fee patent cases.[1]

These three cases are actions to recover title and possession of former allotments on the Rosebud and Pine Ridge Indian Reservations from which the Plaintiffs claim to have been unlawfully denied and excluded and of which they claim to be entitled by virtue of acts of Congress. Plaintiffs further sue for injunctive declaratory relief against the federal Defendants (United States of America, James Watt, as United States Secretary of the Interior, and Ken Smith, as Assistant Secretary of the Interior for Indian Affairs), claiming that the federal Defendants have breached their fiduciary duty imposed by law to protect and defend Plaintiffs' rights to the subject property and profits therefrom and ordering the federal Defendants to take all action necessary to protect and defend the Plaintiffs' rights to the subject property and the profits therefrom. In *Potter* and *Ecoffey*, the Plaintiffs also seek money damages from the federal Defendants. In addition, the Plaintiffs have sued certain non-federal Defendants.

In *Nichols*, the Plaintiff sued private defendants, Rysavy, *et al.*, (present and past owners/occupiers from July 15, 1943 to present) for damages for trespass, conversion and unlawful exclusion from the subject property, an accounting for rents and profits, and for injunctive relief to enjoin them from interfering with plaintiff's free use and enjoyment of the land.[2] Katherine Nichols is the Special Administratrix of the Estate of Amelia Nichols, Rosebud Sioux Allottee No. 593. Ms. Nichols is a daughter-in-law, not a lineal descendant of Amelia Nichols.

In *Potter*, the Plaintiff seeks money damages against the State of South Dakota, because South Dakota, through its Rural Credit Board, foreclosed against this property in 1927, and retained the mineral rights. The surface estate was later sold. The Plaintiff claims that the foreclosure and retention of mineral rights violated her civil rights under 42 U.S.C. § 1983. The Plaintiff also seeks an order declaring that the South Dakota state court judgment is null and void. Defendant Jacob Sharp is the present owner. No past landowners were joined in this action. Clover Potter is a lineal descendant and Special Administratrix of the Estate of James Wilde, Oglala Sioux Tribe, Pine Ridge Agency, Allottee No. 3759.

In *Ecoffey*, the Plaintiff seeks damages against Washabaugh County, claiming that the County violated her civil rights under 42 U.S.C. § 1983 by levying taxes on land upon which a void fee patent was issued. Washabaugh County levied taxes on the property in the amount of $403.77 after the issuance of the fee patent. No past or present landowners were joined in this action. Gladys Ecoffey is a lineal descendant and Special Administratrix of the Estate of John Yellow Bird, Pine Ridge Allottee No. 4202.

In addition, each of the non-federal defendants in all three cases have cross-claimed against the federal government, seeking indemnification if they are held liable. In *Nichols*, Defendant Novotny has also filed a counterclaim against the Plaintiff seeking compensation for improvements made on the property.

## HISTORICAL PERSPECTIVE

"The origin of the forced fee patent claims can be traced to the period in the administration of Indian affairs known as the allotment period, 1887 to 1933." LaFave, *supra*, at 62. In South Dakota, this

---

**1.** Forced fee patent claims are based on the issuance of fee patents to Indian allottees without their application or express consent, and before the expiration of the standard 25-year trust period. Such patents were issued in two ways: 1) competency commissions declared an Indian allottee competent to assume full ownership of allotment; or 2) allottees of one-half or less Indian blood quantum were issued patents

as a matter of policy. LaFave, *South Dakota's Forced Fee Indian Land Claims: Will Landowners Be Liable For Government's Wrongdoing?* 30 S.D.L.Rev. 60, 61 FN 5 (1985).

**2.** Nine title insurance companies jointly filed an amici curiae brief on behalf of the Defendants in *Nichols v. Rysavy*.

requires the examination of three Acts: 1) The General Allotment Act (Dawes Act) of 1887[3], 2) Act of March 2, 1889,[4] and 3) The Burke Act of 1906.[5]

## A. GENERAL ALLOTMENT ACT (DAWES ACT) OF 1887

Under the Dawes Act, individual Indians received parcels of land, called allotments, title to which was to be held in trust by the United States for the benefit of the allottee for a period of twenty-five years. During the trust period, the land could not be sold, mortgaged or taxed. After expiration of the trust period, the allottees would receive an unrestricted fee patent to the allotment, along with full United States citizenship. Although the trust period was to have expired twenty-five years after the issuance of the allotment, the trust period was extended indefinitely by Congress, and has never expired. LaFave, *supra*, at 64 and 70.

## B. ACT OF MARCH 2, 1889

An Act of March 2, 1889, divided the Great Sioux Reservation into several smaller reservations. This Act provided a scheme for allotments in Western South Dakota. This Act also incorporated Section 6 of the General Allotment Act (Dawes Act). Ch. 405, 25 Stat. 888.

## C. BURKE ACT OF 1906

The Burke Act of 1906, 25 U.S.C. § 349, amended Section 6 of the General Allotment Act. This amendment was enacted in response to two different situations. First, was the 1905 case of *Matter of Heff,* 197 U.S. 488, 25 S.Ct. 506, 49 L.Ed. 848 (1905), in which the U.S. Supreme Court declared Indians became citizens upon the initial issuance of an allotment. This meant that the Indians were subject to state law, particularly the sale of liquor. Second, was the increasing number of bills enacted by Congress authorizing the issuance of unrestricted fee patents prior to the expiration of the trust period to allottees who were specifically named in the legislation. LaFave, *supra*, at 65–66.

The Burke Act deferred citizenship until the allottee received a fee patent. More importantly, the Burke Act delegated to the Secretary of the Interior the authority to issue fee patents to allottees prior to the expiration of the trust period. 25 U.S.C. § 349.

After passage of the Burke Act, the Secretary of the Interior issued fee patents to Indian allottees who applied for such patents and were deemed competent (usually on the recommendation of the local Indian superintendent). This policy of issuing fee patents only to allottees who applied for them continued until 1916. LaFave, *supra*, at 66–68; Cohen, *Handbook of Federal Indian Law* 136–137 (1982).

In 1916, Secretary of the Interior, Franklin K. Lane and Commissioner of Indian Affairs, Cato Sells, established a new policy. Officials of the Department of the Interior were assigned to "competency commissions" and directed to visit reservations and determine whether individual Indian allottees were competent. Fee patents were issued to allottees found to be competent by these competency commissions regardless of whether the allottee applied for a patent.

On April 17, 1917, the Department of the Interior's policy regarding the issuance of fee patents to allottees was modified further by a document entitled "A Declaration of Policy" issued by Commissioner Sells and Secretary Lane. Under the terms of the declaration, competency commissions thenceforward were to investigate only allottees of one-half or more Indian blood. Allottees of less than one-half Indian blood were to be given their fee patents without investigation. The declaration provided:

> To all able-bodied adult Indians of less than one-half Indian blood, there will be given as far as may be under the law full and complete control of all their property. Patents in fee shall be issued to all adult Indians of one-half or more Indian

---

**3.** Ch. 119, 24 Stat. 388 (Codified as amended at 25 U.S.C. §§ 331–334, 339, 341, 342, 348, 349, 354, and 381).

**4.** Ch. 405, 25 Stat. 888.

**5.** Ch. 2348, 34 Stat. 182 (Codified at 25 U.S.C. § 349).

blood who may, after careful investigation, be found competent, provided, that where deemed advisable patents in fee shall be withheld for not to exceed 40 acres as a home.

Indian students, when they are 21 years of age or over, complete the full course of instruction in the government schools, receive diplomas and have demonstrated competency will be so declared.

LaFave, *supra,* at 68.

In 1919, the policy of presuming that allottees of less than one-half Indian blood were competent was extended to include allottees with one-half Indian blood. *Id.*

In 1921, the newly-elected Harding Administration ended the policy of issuing fee patents to Indians without application. Charles H. Burke, the former congressman from South Dakota and author of the Burke Act, became the Commissioner of Indian Affairs. On April 1, 1921, he announced that an application and examination of competency would be required for all allottees who received fee simple patents after that date.

Mr. Burke claimed that his policy was consistent with the original intent of the Burke Act, and that the previous administration's policy had violated the drafter's intent:

Although for a few years prior to 1921 great numbers of patents were issued during the trust period without application by or consent of patentees, under an erroneous construction of the Act of 1906, the practice was discontinued, and the Office and the Department are endeavoring to remedy as far as possible conditions resulting from the unauthorized release of the property and to protect the interests of those whom patents were issued without warrant of law, and the lands are not beyond recovery.

LaFave, *supra,* at 69 (citing Letter from Commissioner Charles Burke to William Spotted Eagle (January 29, 1929)).

[Mr.] Burke also offered recipients of forced fees, upon application to the Indi-

an Office, an opportunity to request Department of Justice assistance in protecting tax payments or recovering land where tax deeds had been issued. Burke also supported a test case arising out of Idaho involving two Coeur d' Alene Indians who refused a forced fee patent. In *United States v. Benewah County* [290 Fed. 628], the Court upheld concellation of the patent and return of the land to trust status. The authority of the Secretary of the Interior to cancel forced fee patents, provided the land had not been encumbered or sold, was codified in the Cancellation Acts of 1927 and 1931. [25 U.S.C. § 352a and 25 U.S.C. § 352b].

LaFave, *supra,* at 69.

In 1934, Congress enacted the Indian Reorganization Act.[6] This Act "extended the trust period indefinitely, halted future allotments, restricted land sales, except to tribes, and attempted through various provisions to stabilize the tribal land base." *Id.* at 70.

### HISTORY OF PLAINTIFFS' ALLOTMENTS

1. Amelia Nichols (Nichols v. Rysavy, *et al*)

On April 27, 1909, Amelia Nichols, a mixed blood member of the Rosebud Sioux Tribe, was issued a trust patent for Allotment No. 593. She signed a receipt for this allotment on July 29, 1914. On April 17, 1917, the Commissioner of Indian Affairs established a new policy whereby all allottees of less than one-half Indian blood would be issued a fee patent, whether or not they desired one. As a result of this policy, Amelia Nichols was issued a fee patent for Allotment No. 593 on December 29, 1917 by the Secretary of the Interior without her prior consent. She signed a receipt for the fee patent on January 30, 1918. Allotment No. 593 was subsequently conveyed by warranty deed by Amelia Nichols to C.E. Plummer on October 12, 1918 and by mesne conveyance to Defendant James Rysavy on July 15, 1943.

---

**6.** Ch. 576, 48 Stat. 984 (Codified as amended at 25 U.S.C. §§ 461, 462, 463, 464, 465, 466–470, 471–473, 474, 475, 476–478, 479).

2. James Wilde (Potter v. State of South Dakota, *et al*)

On January 12, 1911, James Wilde was issued a trust patent for Allotment No. 3759 on the Pine Ridge Reservation. No receipt was found for this trust patent. James Wilde, like Amelia Nichols, had less than one-half Indian blood and was issued a fee patent for the allotment on April 13, 1918, without his prior consent. Mr. Wilde signed a receipt for the fee patent.

Mr. Wilde transferred the property to Grace Wilde by warranty deed on June 30, 1919. At that time the property was subject to two mortgages to the State Bank of Interior. James and Grace Wilde then mortgaged the land to South Dakota Rural Credit Board on April 27, 1920.

On May 5, 1925, Grace Wilde, by warranty deed, transferred the real property back to James Wilde. On July 16, 1925, Mr. Wilde wrote to the Commissioner of Indian Affairs requesting the fee patent be cancelled. The requested cancellation was denied.

On April 9, 1928, the State of South Dakota was issued a sheriff's deed for the property pursuant to a mortgage foreclosure proceeding. On October 2, 1940, the State sold the property to Clyde Sharp for $4,500.00 stated consideration. At that time the State reserved all mineral interests pursuant to state law. The surface ownership was thereafter transferred on several occasions.

3. John Yellow Bird (Ecoffey v. Washabaugh County, *et al*)

John Yellow Bird was issued a trust patent for Allotment No. 4202 on January 12, 1911. Like the other Plaintiffs' Decedents, Mr. Yellow Bird had less than one-half Indian blood and was issued a fee patent for the allotment on September 29, 1918, without his prior consent. Mr. Yellow Bird signed a receipt for the fee patent. Prior to Yellow Bird's conveyance to William Munger by warranty deed on April 28, 1923, Washabaugh County levied taxes on the property in the amount of $403.77. Thereafter, other conveyances were made until title to the property ended up with Betty Isenbraun on April 16, 1981.

## LEGAL ISSUES

The complexity of this case can best be expressed by the number of issues raised by the various motions to dismiss.

| | | Nichols | Potter | Ecoffey |
|---|---|---|---|---|
| 1) | Sovereign Immunity | X | X | X |
| 2) | Lack of subject matter jurisdiction | X | | |
| 3) | Cancellation acts (25 U.S.C. §§ 352a and 352b) are exclusive remedies | X | X | X |
| 4) | Plaintiff's decedent consented to issuance of patent | X | | |
| 5) | Failure to join indispensable parties | X | | |
| 6) | Laches/BFP/Equitable Estoppel | X | X | X |
| 7) | Action against SD barred by 11th Amendment | | X | |
| 8) | Action against state pursuant to 42 U.S.C. § 1983 barred because state is not a person | | X | |
| 9) | Statute of Limitations, 28 U.S.C. § 2401(a) | X | X | X |
| 10) | U.S. is an indispensable party which cannot be joined | X | X | X |
| 11) | Past and present owners are indispensable parties and cannot be joined | | X | |
| 12) | Impermissible collateral attack on patent by a third party | X | X | X |
| 13) | Nonjustible political question | | X | |
| 14) | Matter committed to agency discretion | | X | X |
| 15) | Burke Act allows imposition of fee patents without application of allottee | | X | X |

| | | Nichols | Potter | Ecoffey |
|---|---|---|---|---|
| 16) | 1917 rules of issuing fee patents without application to allottees of one-half Indian blood or less does not constitute denial of equal protection | | X | |
| 17) | Failure to state claim—no constitutionally protected vested right to have an allotment held in trust for 25 years | | X | X |
| 18) | State law bars claim | X | X | |
| 19) | Allottee consented to issuance of fee patent as a matter of law | | X | X |
| 20) | 25 U.S.C. § 345 provides exclusive remedy | X | | |
| 21) | Remedy of cancellation of fee patent not available | X | | |
| 22) | Plaintiff lacks standing under 42 U.S.C. § 1983 | | | X |
| 23) | Moot | | | X |
| 24) | 1917 rules which permitted issuance of·fee patents without application are valid. | | | X |

However, due to the dispositive nature of this opinion, it was not necessary for this Court to discuss every issue.

## DECISION

### A. SOVEREIGN IMMUNITY

■ The first issue this Court must decide is whether the action against the United States is barred by the doctrine of sovereign immunity. It is well settled that the United States may not be sued without its consent, and that only Congress can waive sovereign immunity. Wright, Miller and Cooper, *Federal Practice and Procedure* § 3654. "Moreover, if Congress in fact has consented to a particular kind of suit, it may define the conditions under which it is willing to be sued and the general rule long has been that the government's consent is to be strictly interpreted." *Id.*

The Plaintiffs, in their Complaint, make the following claim:

The consent of the United States to this action is … contained in 25 U.S.C. § 345 and 346. The United States has also consented to this action by officially notifying the heirs of [the Plaintiff] that it will not file this action as their trustee under 28 U.S.C. § 2415 and that they must file it on their own behalf.

25 U.S.C. § 345 provides that:

All persons who are in whole or in part of Indian blood or descent who are entitled to an allotment of land under any law of Congress, or who claim to be so entitled to land under any allotment Act or under any grant made by Congress, or who claim to have been unlawfully denied or excluded from any allotment or any parcel of land to which they claim to be lawfully entitled by virtue of any Act of Congress, may commence and prosecute or defend any action, suit, or proceeding in relation to their right thereto in the proper district court of the United States; and said district courts are given jurisdiction to try and determine any action, suit, or proceeding arising within their respective jurisdictions involving the right of any person, in whole or in part of Indian blood or descent, to any allotment of land under any law or treaty (and in said suit the parties thereto shall be the claimant as plaintiff and the United States as party defendant); and the judgment or decree of any such court in favor of any claimant to an allotment of land shall have the same effect, when properly certified to the Secretary of the Interior, as if such allotment had been allowed and approved by him, but this provision shall not apply to any lands now held by either of the Five Civilized Tribes, nor to any of the lands within the Quapaw Indian Agency: Provided, That the right of appeal shall be allowed to either party as in other cases.

■ Section 345 is a limited consent by the United States to suit. *Scholder v.*

*U.S.*, 428 F.2d 1123, 1126 (9th Cir.1970). Although this statute does waiver sovereign immunity for certain cases involving allotments, the claims presented by the Plaintiffs fall outside the scope of 25 U.S.C. § 345 because the present action is not an action for an allotment.

As stated in Cohen, jurisdiction under § 345

> includes actions by Indians to quiet title or recover possession of previously granted allotments or portions thereof, and to adjudicate other rights connected with beneficial ownership of the allotment. The statute does not confer jurisdiction to challenge administrative policies of the Department of the Interior, or jurisdiction over actions by non-Indians. Nor does it apply to Indian lands other than allotments. The basic requisite for jurisdiction is an issue covering Indian ownership of all or a portion of an allotment under federal restrictions.

F. Cohen, *Handbook of Federal Indian Law* 314 (1982).

The U.S. Supreme Court, in *Affiliated Ute Citizens of Utah v. United States,* defined the word "allotment" in the following manner:

> Allotment is a term of art in Indian law. (citation omitted). It means a selection of specific land awarded to an individual allottee from a common holding. (citation omitted). Section 345 authorizes and provides governmental consent for only actions for allotments.

406 U.S. 128, 142, 92 S.Ct. 1456, 1466, 31 L.Ed.2d 741 (1972).

Cohen provides a more useful definition of an allotment, stating that an allotment describes "either a parcel of land owned by the United States in trust for an Indian ('trust' allotment), or owned by an Indian subject to a restriction on alienation in favor of the United States or its officials ('restricted fee' allotment)." Cohen at 615–616.

In this action, the Plaintiffs' decedents were issued trust patents. The Plaintiffs then allege that the Secretary of the Interior erroneously issued a fee patent to the Plaintiffs' decedents. When they received their fee patents, the lands lost their status as trust lands. *Larkin v. Paugh,* 276 U.S. 431, 439, 48 S.Ct. 366, 388, 72 L.Ed. 640 (1928). Thus the land is no longer considered an allotment. The land was later either sold or foreclosed upon, this transferring ownership of the land from the Plaintiffs' decedent to another person. The Plaintiffs now seek to have the land taken from its current occupants and returned to trust status. Applying the two definitions of allotments to the current situation, it is clear that § 345 does not apply because the action does not involve an allotment, but deals with land held in fee by the present owners. Therefore, § 345 is not a waiver of sovereign immunity.

■ The Plaintiffs also claim that the United States gave its consent by officially notifying the heirs of [the Plaintiffs' decedents] that it will not file this action as their trustee under 28 U.S.C. § 2415 and that they must file it on their own behalf.

This claim is without merit. 28 U.S.C. § 2415 is a statute of limitations. Nothing in § 2415 provides a waiver of sovereign immunity. In order for this Court to have jurisdiction, there must be an express statutory waiver of immunity. *Champaign-Urbana News v. J.L. Cummins,* 632 F.2d 680 (7th Cir.1980). Section 2415 does not provide this waiver. Therefore, the United States is dismissed as a party in all three actions.

## B. STATUTE OF LIMITATIONS

■ Even assuming that 25 U.S.C. § 345 does provide a waiver of sovereign immunity, the Defendants allege that the action against the United States would be barred by 28 U.S.C. § 2401(a). Section 2401(a) does apply to actions brought under 25 U.S.C. § 345. *Christensen v. U.S.,* 755 F.2d 705 (9th Cir.1985). Section 2401(a) provides that

> Except as provided by the Contract Disputes Act of 1978, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues. The action of any person under legal disability or beyond the seas

at the time the claim accrues may be commenced within three years after the disability ceases.

However, if the patent is void, § 2401(a) would not apply to this action. *See Mottaz v. U.S.,* 753 F.2d 71 (8th Cir.1985).

A patent is void and inoperative if the government does not own the property, or has previously conveyed it, or if it is granted under a mistaken notion of the law and without authority, or if the grant is directly contrary to the governing law, or if the land has previously been reserved, appropriated, or dedicated to uses which preclude its sale.

63A Am.Jur.2d Public Lands § 80.

■ The patent in this case was issued pursuant to the Burke Act of 1906, 25 U.S.C. § 349. This statute granted the discretionary authority to the Secretary of the Interior to issue fee patents to allottees he deemed competent and capable of handling his or her affairs. The Plaintiffs allege that the Burke Act never applied to tribes covered by the Act of March 2, 1889, and therefore, all of the fee patents are void. This argument is based on an analysis of other special allotment acts and rules of statutory construction. However, congressional intent indicates otherwise. The following exchange took place during the House debate of the Burke Act:

> MR. FINLEY. Where are the Indians located who will be affected by this bill?
>
> MR. BURKE of South Dakota. Mostly in the reservations of the country, if not entirely in the reservations.
>
> MR. FINLEY. Within all the States and Territories? What Indians?
>
> MR. BURKE of South Dakota. The *South Dakota Indians* probably more than others.

40 Cong.Rec. 3600 (March 9, 1906) (emphasis added). As stated in *National Woodwork Mfrs. Ass'n v. N.L.R.B.,* "[i]t is the sponsor we look to when the meaning of statutory words are in doubt." 386 U.S. 612, 640, 87 S.Ct. 1250, 1266, 18 L.Ed.2d 357 (1967). Thus, it was the intent of Congress to have the Burke Act apply to South Dakota. Therefore, because the patent was issued under the authority of 25 U.S.C.

§ 349, the patent is not void. Because more than six years have elapsed, this action is barred by 28 U.S.C. § 2401(a). Therefore, the United States will also be dismissed as a party in all three actions because of the statute of limitations contained in 28 U.S.C. § 2401(a).

## C. INDISPENSABLE PARTY

■ The next issue this Court must decide is whether the United States is an indispensable party. F.R.C.P. 19(b) provides for the dismissal of the entire action if the United States is regarded as an indispensable party.

Upon examining the factors set out in Rule 19(b), it is clear that the United States is an indispensable party. The Plaintiffs wish to have the land returned to trust status, eject the present occupants, and seek damages. If this is accomplished, the United States would not only have trust responsibility over the land, but could also be subject to claims by present owners and the other Defendants for any damages caused by the issuance of the patent. In addition, the United States is the party who issued the fee patent in question, thus setting the entire series of events in motion that resulted in the action.

■ Even if § 345 provided a waiver of sovereign immunity, the United States is an indispensable party in any action under § 345. *Antoine v. U.S.,* 637 F.2d 1177 (8th Cir.1981). However, as stated in Section B, *supra,* § 2401(a) would bar the action against the United States, thus compelling the dismissal of the entire action. This Court cannot in good conscience let this action proceed without the United States as a party. Therefore, all three actions will be dismissed with prejudice as to all Defendants.

## D. COLLATERAL ATTACK ON PATENT BY THIRD PARTY

■ The non-federal Defendants also argue that these cases should be dismissed because the Plaintiffs' complaints represent an impermissible collateral attack on a patent by a third party. In regard to a

patent issued by the United States, the following well-established rules of law apply:

> A patent to land, issued by the United States under authority of law, is the highest evidence of title, something upon which its holder can rely for peace and security in his possession. It is conclusive evidence of title against the United States and all the world, until cancelled or modified by an action brought for this purpose. 2 *The American Law of Mining,* § 1.29 at 357.
>
> The issuance of the patent creates a presumption that all requisite steps and requirements of law and department regulations have been fully complied with. *Wright-Blodgett Co. v. United States,* 236 U.S. 397, 35 S.Ct. 339, 59 L.Ed. 637 (1915).
>
> A leading treatise states: ... a patent which is regular in form and for whose issuance there is statutory authority is so binding on the government that a purchaser from the patentee need make no investigation as to the details of its issuance—the legal title has passed and the patent is conclusive against the government. 2 *Patton on Land Title,* § 292, pages 26, 27.

*U.S. v. Eaton Shale Co.,* 433 F.Supp. 1256, 1267 (D.Colo.1977).

The general rule is that "an attack on a patent generally may be made only in a direct proceeding by the government." 63 Am.Jur.2d Public Lands § 82. However, "a patent *regular on its face* and issued by the land department within its authorized jurisdiction is conclusive and only subject to collateral attack on grounds that the patent is completely void." *Phelps Dodge v. State of Arizona,* 548 F.2d 1383, 1386 (9th Cir.1977) (emphasis added). As stated in Section B, *supra,* the patents were issued within the discretionary authority of the Secretary of the Interior and therefore, are not void. Thus, the Plaintiffs' complaints are impermissible collateral attacks on a patent by a third party. Therefore, all non-federal Defendants would be dismissed with prejudice for failure to state a claim even if the federal Defendants were not dismissed.

## CONCLUSION

This Court feels compelled to address certain issues, although not dispositive, that are directly related to the forced fee patent claims. "It has been estimated that 9,500 forced fee claims affecting 1.5 to two million acres could be brought in the western United States...." LaFave at 61. Thus, these forced fee patent claims have far reaching social, economic, and political ramifications that were not fully considered when 28 U.S.C. § 2415 was amended. Title to millions of acres of land is clouded, thus affecting real estate transactions, probate proceedings, and credit availability. In other words, thousands of landowners are effectively barred from selling their land.

Another ramification involves the validity of a fee patent issued by the U.S. Government. If these fee patents can be successfully attacked, the entire United States title system is in jeopardy. Title insurance companies, who relied on the fee patent, would face financial ruin. "The return of the land to trust status would potentially result in a checkerboard effect on civil and criminal jurisdiction, and would certainly remove the land from the tax base of the county and local school district." LaFave at 96. If the land were returned to the Plaintiffs, the government would "hold in trust for the benefit of the allottee's heirs, fractionalized shares in the original 160-acre allotment." *Id.* This would be a hollow victory for the Plaintiffs.

Meanwhile, non-federal defendants, innocent of any possible wrongdoing, face ejectment and thousands of dollars in attorney's fees. Although this case does not fit the criteria so as to be classified as a political question, the forced fee patent claims cry out for a legislative solution, and not a judicial solution.