Katherine B. NICHOLS, Individually and as Special Administratrix of the Estate of Amelia Huston Nichols No. 593, Deceased, Appellant,

v.

Don RYSAVY, Margaret Rysavy, Raymond DeMers, Leo Novotny, Raymont DeMers, Geraldine DeMers, Doris Rysavy, Estates of W. & A. Rysavy, J. Rysavy, James Rysavy, William Rysavy, Amelia Rysavy, the United States of America, Hon. Donald P. Hodel as United States Secretary of the Interior, Ken Smith as Assistant Secretary of the Interior for Indian Affairs, Appellees.

Clover POTTER, Individually and as the Special Administratrix of the Estate of James Wilde, Appellant,

v.

STATE OF SOUTH DAKOTA, United States of America, Donald P. Hodel as U.S. Secretary of the Interior, Ken Smith as Assistant Secretary of the Interior for Indian Affairs, Appellees.

Gladys ECOFFEY, Individually and as Special Administratrix of the Estate of John Yellow Bird, Appellant,

v.

WASHABAUGH COUNTY, United States of America, Donald P. Hodel as U.S. Secretary of the Interior, Ken Smith as Assistant Secretary of the Interior for Indian Affairs, Appellees.

Chicago Title Insurance Company, First American Title Insurance Company, Lawyers Title Insurance Corporation, Safeco Title Insurance Company of Idaho, Stewart Title Guaranty Company, Ticor Title Insurance Company, Title Insurance Company of Minnesota, Transamerica Title Insurance Company, USLIFE Title Insurance Company of America, Amici Curiae For Appellees.

---

**1318**

Rosemond GOINS, Individually and as Special Administratrix of the Estate of Ida Huston Roubideaux, Appellants,

v.

Nick ASSMAN, Edwin Assman, W.O. Assman, William Assman, Isabelle Assman, Dorothy Assman, Donald Assman, Clarence Assman, Sadie Assman, Joe Assman, Esther Assman, Assman Realty, the United States of America, Honorable James Watt, as United States Secretary of the Interior; Ken Smith, as Assistant Secretary of the Interior for Indian Affairs, Appellees.

Lois Emery FALLIS, Individually and on behalf of the Heirs, Devisees, Benefactors and Assigns of Robert Emery, deceased, Appellant,

v.

G.W. HOLMES and Delores Holmes, United States of America, Honorable William Horn, United States Secretary of the Interior and Ross Swimmer, as Assistant Secretary of the Interior for Indian Affairs, Appellees.

Shirley Lee BORDEAUX, Individually and as Special Administratrix of the Estate of Clara Hudson, No. 3196, deceased, Appellant,

v.

Mary Ann HUNT, Estate of Lyle T. Hunt; Alvina Woockmann, The United States of America: Honorable Donald Hodel, as United States Secretary of the Interior; Ken Smith, as Assistant Secretary of the Interior for Indian Affairs, Appellees.

Mary PRITZKAU, Individually and as Special Administratrix of the Estate of Narcisse Rich, Allotment No. 1163, Deceased, Appellant,

v.

COTTONWOOD RANCH & LIVESTOCK CO., Charles Steen, Vera Steen, Louis Buduhl, Chester Buduhl, the United States of America, Honorable Donald Hodel, as Secretary of the Interior; Ken Smith, Secretary of the Interior for Indian Affairs, Tri-County Water Association, Appellees.

Mary H. PRITZKAU, Individually and as Special Administratrix of the Estate of Julia Narcelle, Appellant,

v.

Helen LARSON, Estate of Clifford Larson; Ziebach County, The United States of America, Honorable Donald Hodel, as United States Secretary of the Interior; and Ken Smith, Assistant Secretary of the Interior for Indian Affairs, Appellees.

Elsie BONSER, Individually and as Estate Administratrix of the Estate of Mattie J. Bonser, No. 142½, Deceased, Appellant,

v.

Ruth SHELBOURN; Julius Wahl; Dorothy Wahl; Todd County Independent School District; Joseph Shelbourn; Floyd Reagle; Ethelena Reagle; The United States of America; Honorable Donald Hodel, as United States Secretary of the Interior and Ken Smith, as Assistant Secretary of the Interior for Indian Affairs, Appellees.

Anna Rose LAPOINTE, Individually, and as Special Administratrix of the Estate of Lena Lima Bourdeaux, Appellant,

v.

C. & M. McCORMICK; Mary Abdellah; Charles McCormick; Will Maggrett; United States of America; Honorable Donald Hodel, as United States Secretary of the Interior and Ken Smith, as Assistant Secretary of the Interior for Indian Affairs, Appellees.

Duane R. SANOVIA, Individually and as Special Administrator of the Estate of James Sanovia, Deceased, Appellant,

v.

Leslie HANDCOCK, Thelma Handcock, Mae Handcock, Estate of M.D. Handcock, United States of America; Donald Hodel, Secretary of the Interior; Ken Smith, Assistant Secretary of the Interior for Indian Affairs, Appellees.

Mary Louise BORDEAUX, Individually and as Special Administratrix of the Estate of Clementine Hudson, Appellant,

v.

Henry HORN, Marion Horn, Elmer Horn, Estate of A. Horn, Anna Horn, United States of America; Honorable Donald Hodel, as Secretary of the Interior; Ken Smith, Assistant Secretary of the Interior for Indian Affairs, Appellees.

Marceline HASTINGS, Individually, and as Special Administratrix of the Estate of Frank McCloskey, Deceased, Appellant,

v.

PLATTE VALLEY AND INVESTMENT CO.; Earl Hollenbeck; Vincent Hollenbeck; V. Hollenbeck; The United States of America; Honorable Donald Hodel, as United States Secretary of the Interior and Ken Smith, as Assistant Secretary of the Interior for Indian Affairs, Appellees.

Marceline HASTINGS, Individually and as Special Administrator of the Estate of Mary Pure Blacksmith, Deceased, Appellants,

v.

Frank MASSA, Esther Massa, Guisto Massa, Maria Massa, Charlotte Abrams, a/k/a C. Cherniak; The United States of America; Honorable Donald Hodel, as Secretary of the Interior; Ken Smith, as Assistant Secretary of the Interior for Indian Affairs, Appellees.

Nos. 85–5234, 85–5432, 85–5445, 86–5034 to 86–5042.

United States Court of Appeals, Eighth Circuit.

Submitted May 13, 1986.

Decided Jan. 15, 1987.

Rehearing and Rehearing En Banc Denied Feb. 25, 1987.

Before LAY, Chief Judge, HENLEY, Senior Circuit Judge, and MAGILL, Circuit Judge.

MAGILL, Circuit Judge.

From 1916 to 1921, appellants' ancestors received fee simple patents, granting them full title to land allotments originally held for them in trust by the United States. These fourteen cases, consolidated on appeal, stem from the government's issuance of those fee patents. Appellants claim that the fee patents were illegally issued to their forebears, thus voiding all later transfers of the property. Appellants seek recognition that the land is still held in trust, return of possession, damages for wrongful possession, and attorneys' fees. Appellees are the United States, the State of South Dakota, Washabaugh County, South Dakota (now Jackson County), and various private landowners who obtained the land in good faith through chain of title. Several title insurance companies filed amicus curiae briefs for appellees. The district courts [1] entered summary judgment for appellees. We affirm, based on the following: (1) We do not reach the legality of the forced fee patents, as our disposition rests on purely procedural grounds. (2) The statute of limitations in 28 U.S.C. § 2401(a) bars this action as against the United States. (3) The United States is an indispensable party, requiring dismissal of the action as to all appellants with prejudice. (4) Another potential source of limitation on appellants' claims is 25 U.S.C. § 347.

## I. HISTORICAL BACKGROUND.

These cases arise from the General Allotment Act (Dawes Act) of February 8, 1887, Ch. 119, 24 Stat. 388 (codified as amended at 25 U.S.C. § 331 *et seq.*). The Dawes Act reflected a:

> policy of encouraging the assimilation of Indians into the white man's culture. * * * This policy was carried out by "alloting" to individual Indians sufficient resources

Kim Gottschalk, Boulder, Colo., for appellant.

Maria Iizuka, Washington, D.C., for Government.

John Guhin, Pierre, S.D., for State.

Tom Tobin, Winner, S.D., for private parties.

---

1. The Hon. Andrew W. Bogue, Chief Judge, United States District Court for the District of South Dakota, Western Division, and The Hon. Donald J. Porter, Chief Judge, United States District Court for the District of South Dakota, Central Division.

to enable them to become independent farmers and ranchers. \* \* \* As stated in [a] Senate Report [in 1907]:

> The policy of alloting Indian lands in severality, so as to break up the old tribal relations, has been going on for years. Ultimately the Indian must become a citizen and work upon the new lines necessarily created by his present environments. He must learn to farm, to raise live stock, and to abandon the aboriginal methods of life. Large areas of Indian lands have already been thus alloted, and many of the tribes have become farmers and stock raisers.

*United States v. Overlie,* 730 F.2d 1159, 1162 (8th Cir.1984).

The Dawes Act divided up Indian reservations when they could "be advantageously utilized for agricultural or grazing purposes" by the Indians. Indians then received individual land allotments, with the United States holding title in trust for the allottees for twenty-five years, during which time an allotment could not be sold, mortgaged, or taxed. After twenty-five years, the allottee or his heirs received the land in fee simple.

The main purpose of the twenty-five-year trust period was "for the new citizen to become accustomed to his new life, to learn his rights as a citizen, and prepare himself to cope on an equal footing with any white man who might attempt to cheat him out of his newly acquired property \* \* \*." Statement of Rep. Skinner, 18 Cong.Rec. 190 (1886), *quoted in United States v. Mitchell,* 445 U.S. 535, 544 n. 5, 100 S.Ct. 1349, 1354–55 n. 5, 63 L.Ed.2d 607 (1980).

In South Dakota, individual Indian allotments were created by the Act of March 2, 1889, Ch. 405, 25 Stat. 888, which divided the Great Sioux Reservation into seven smaller reservations. *See United States v. Erickson,* 478 F.2d 684, 686 (8th Cir.1973). Sections 8 through 11 of the 1889 Act au-thorized individual allotments, similar to those created under the Dawes Act, and section 11 provided that "each and every allottee under this act shall be entitled to all the rights and privileges and be subject to all the provisions of section six of" the Dawes Act. Section 6 of the Dawes Act stated that "[u]pon the completion of said allotments and the patenting of the lands to said allottees," the allottees would become United States citizens and be subject to the laws of the state or territory in which they lived.

The Supreme Court, in *Matter of Heff,* 197 U.S. 488, 25 S.Ct. 506, 49 L.Ed. 848 (1905), construed section 6 of the Dawes Act to give Indians citizenship and thus subject them to state laws upon the initial issuance of an allotment. In part reacting to this decision, Congress, in the Burke Act of 1906, Ch. 2348, 34 Stat. 182 (codified at 25 U.S.C. § 349), amended section 6 of the Dawes Act to defer citizenship until "the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee \* \* \*." Congress also enacted in the Burke Act the language central to this case:

> *Provided,* That the Secretary of the Interior may, in his discretion, and he is authorized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs at any time to cause to be issued to such allottee a patent in fee simple, and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed \* \* \*.

Thus the Burke Act shifted the responsibility of issuing fee patents from Congress to the Secretary of the Interior, and gave the Secretary authority to issue fee patents to allottees before the trust period expired.[2] The reason for this shift in responsibility was reflected in the House Committee report:

> trust period ended. H.R.Rep. No. 1558, 59th Cong., 1st Sess. 2 (1906); *Monson v. Simonson,* 231 U.S. 341, 346, 34 S.Ct. 71, 72–73, 58 L.Ed. 260 (1913).

**2.** Even before this amendment, however, special legislation had been enacted during each session of Congress granting fee simple patents to individual allottees before the twenty-five-year

this provision * * * will make it unnecessary for legislation granting fee-simple patents to individual Indian allottees, as has been done in every session of Congress for several years, and it places the responsibility upon the Secretary of the Interior and the Indian Department, who know best when an Indian has reached such a stage of civilization as to be able and capable of managing his own affairs. H.R.Rep. No. 1558, 59th Cong., 1st Sess. 2 (1906).

Another explanation is that the Burke Act was "intended to accelerate the assimilation of the Indians by truncating the length of the trust period and the benefits derived therefrom for Indians determined to be competent." *County of Thurston, State of Nebraska v. Andrus*, 586 F.2d 1212, 1219 (8th Cir.1978), *cert. denied*, 441 U.S. 952, 99 S.Ct. 2181, 60 L.Ed.2d 1057 (1979).

From 1906 to 1916, the Secretary of the Interior granted early fee patents only to allottees who applied and were deemed competent, generally on the local Indian superintendent's recommendation. In 1916, however, Secretary of the Interior Franklin K. Lane began a new policy. Officials of the Department of the Interior were told to visit reservations and determine whether individual Indian allottees were competent. These "competency commissions" issued fee patents to allottees they found competent whether or not the allottees applied for a patent. This became known as the "forced fee patent" policy. Secretary Lane stated, in support of the plan: "we should henceforth make a positive and systematic effort to cast the full burden of independence and responsibility upon an increasing number of the Indians of all tribes. * * * To turn the Indian loose from the bonds of governmental control, * * * this program we are adventuring upon." Letter from Secretary Lane to Representative Stephens, quoting the 1914 Annual Report of the Commissioner of Indian Affairs (ARCIA) (March 8, 1916). Commissioner of Indian Affairs Cato Sells noted, however, that "[u]p to this time no fee patents have been issued to Indian allottees unless they made application therefor. * * * Whether the issuance of patents in fee has been of material benefit to Indian allottees is a debatable question. On some reservations the result was disastrous * * *." Letter from Commissioner Sells to Secretary Lane (May 19, 1915).

On April 17, 1917, Commissioner Sells went a step further and issued "A Declaration of Policy," which provided that competency commissions were now to investigate only allottees of one-half or more Indian blood. Under this "blood quantum" policy, allottees of less than one-half Indian blood were presumed competent and received fee patents without investigation. The declaration stated:

To all able-bodied adult Indians of less than one-half Indian blood; there will be given as far as may be under the law full and complete control of all their property. Patents in fee shall be issued to all adult Indians of one-half or more Indian blood who may, after careful investigation, be found competent, provided, that where deemed advisable patents in fee shall be withheld for not to exceed 40 acres as a home.

Indian students, when they are 21 years of age, or over, who complete the full course of instruction in the Government schools, receive diplomas and have demonstrated competency will be so declared.

1917 ARCIA at 3–4.

In 1919 the presumption of competence was extended to adult allottees of one-half Indian blood.

Thousands of Indians in the western United States received forced fee patents, with primarily harsh results. As Judge Porter stated:

Abuses were rampant: it is clear from the historical evidence * * * that many patents were issued to Indians obviously incapable of taking on the burdens of unrestricted property ownership in the midst of a more sophisticated white society. It is clear that some holders of these patents were cheated out of their land by speculators and merchants, and

that some land was lost when the Indians sold or mortgaged it for money to pay state property taxes, taxes which could not be legally assessed under the rule of *Choate v. Trapp*, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912).

*Bordeaux v. Hunt*, 621 F.Supp. 637, 640 (D.C.S.D.1985).

In 1921, however, the entering Harding Administration reversed Sells' policy. Charles H. Burke, former congressman from South Dakota and author of the Burke Act, became the Commissioner of Indian Affairs. On April 1, 1921, he announced in his annual report that an application and examination of competency would once again be required for all allottees. 1921 ARCIA at 23. Commissioner Burke claimed that the previous policy had violated the intent of the Burke Act:

> Although for a few years prior to 1921 great numbers of patents were issued during the trust period without application by or consent of patentees, under an erroneous construction of the Act of 1906, the practice was discontinued, and the Office and the Department are endeavoring to remedy as far as possible conditions resulting from the unauthorized release of the property and to protect the interests of those to whom patents were issued without warrant of law, and the lands are not beyond recovery.

Letter from Commissioner Burke to William Spotted Eagle (January 29, 1929).

3. The 1927 Cancellation Act allowed the Secretary to cancel:

> any patent in fee simple issued to an Indian allottee or to his heirs before the end of the period of trust described in the original or trust patent issued to such allottee, or before the expiration of any extension of such period of trust by the President, where such patent in fee simple was issued without the consent or an application therefor by the allottee or by his heirs: *Provided,* That the patentee has not mortgaged or sold any part of the land described in such patent: *Provided also,* That upon cancellation of such patent in fee simple the land shall have the same status as though such fee patent had never been issued.

The Cancellation Acts did not give the Secretary complete authority to cancel fee patents, however. Under the 1927 Act, the Secretary could not cancel fee patents where the patentee had

In 1927 and 1931 Congress enacted the Cancellation Acts, 44 Stat. 1247, codified at 25 U.S.C. § 352a; and 46 Stat. 1205, codified at 25 U.S.C. § 352b, which allowed the Secretary of the Interior, in certain circumstances, to return patented land to trust status.[3] Less than 500 forced fee patents were cancelled under these statutes, however.

In 1934 Congress enacted the Indian Reorganization Act, Ch. 576, 48 Stat. 984 (codified as amended at 25 U.S.C. § 461 *et seq.*), which extended the trust period indefinitely, stopped future allotments, restricted land sales except to tribes and generally sought to stabilize the tribal land base. The trust period has never expired.

All of the cases before us arise out of similar facts. The appellants are descendants of Sioux Indians who were issued land allotments and then, before the twenty-five-year trust expired, received fee simple patents without application under the blood quantum policy. All the allottees later transferred or lost title to their property through sale or foreclosure.

## II. DISTRICT COURT PROCEEDINGS.

Fourteen cases are consolidated on appeal.[4] Judge Bogue entered summary judgment in favor of the defendants in three consolidated cases.[5] Judge Porter did the same in the remaining cases.[6]

"mortgaged or sold any part of the land." The 1931 Act permitted cancellation of fee patents as to those portions of allotments which had neither been sold nor mortgaged.

4. Mr. Gottschalk, counsel for appellants, pointed out at oral argument that these cases are "test cases" for a number of similar cases existing nationwide, encompassing a total of about 1.5 million acres of land.

5. *Nichols v. Rysavy,* No. 83–5002; *Potter v. South Dakota,* No. 83–5033; and *Ecoffey v. Washabaugh County,* No. 83–5055, published at 610 F.Supp. 1245 (D.C.S.D.1985).

6. *Goins v. Assman,* No. 82–3079; *Bordeaux v. Hunt,* No. 82–3081; *Pritzkau v. Cottonwood Ranch,* No. 82–3082; *Pritzkau v. Larson,* No. 82–3083; *Bonser v. Shelbourn,* No. 82–3084; *LaPointe v. McCormick,* No. 83–3030; *Sanovia v.*

Before Judge Bogue, appellants argued: (1) that they had a vested right to the full trust period; (2) that the Burke Act was inapplicable to them; (3) that the United States violated its fiduciary duty to them; (4) that the blood quantum policy was illegal; (5) that state foreclosures and county tax levies on the property were invalid; and (6) that the current owners are illegally occupying the land. Judge Bogue based his decision primarily on the finding that the United States, an indispensable party, had not waived its sovereign immunity. He also found that the pertinent statute of limitations, 28 U.S.C. § 2401(a), had expired.

Before Judge Porter, appellants made essentially the same arguments, but without the allegations against the state and county. Judge Porter's opinion addressed the legality of forced patents. He found that the Secretary was within his authority when he issued fee patents without application, and that competency determinations on the basis of age and blood quantum, although "to modern eyes, reprehensible," were also within his authority. Judge Porter also ruled that the allottees consented to the premature issuance of the fee patents.

## III. ISSUES ON APPEAL.

Three major issues are presented on appeal: (1) whether the forced fee patents were void; (2) whether the United States

*Handcock*, No. 83–3036; *Bordeaux v. Horn*, No. 83–3048; *Hastings v. Platte Valley Land Investment Co.*, No. 83–3067; and *Hastings v. Massa*, No. 84–3002, As the cases dealt with an identical issue, only *Bordeaux* was published, at 621 F.Supp. 637 (D.C.S.D.1985).

**7.** 25 U.S.C. § 345, one of the jurisdictional bases for the district court in this case, reads:

All persons who are in whole or in part of Indian blood or descent who are entitled to an allotment of land under any law of Congress, or who claim to be so entitled to land under any allotment Act or under any grant made by Congress, or who claim to have been unlawfully denied or excluded from any allotment or any parcel of land to which they claim to be lawfully entitled by virtue of any Act of Congress, may commence and prosecute or defend any action, suit, or proceeding

has waived its sovereign immunity; and (3) whether these actions are barred by a statute of limitations. We find it unnecessary to resolve the legality of the forced fee patents and the sovereign immunity issue, because the statute of limitations issue is dispositive.

## IV. DISCUSSION.

### A. Standard of Review.

This court clearly set out the standard of review of a district court's grant of summary judgment in *Kegel v. Runnels*, 793 F.2d 924, 926–27 (8th Cir.1986). We adhere to that standard in this case.

### B. District Court Jurisdiction Under Section 345.

Appellants argue that 25 U.S.C. § 345 entitles them to bring this suit against the United States.[7] Appellees' response addresses both appellants' interpretation of section 345 and the threshold question of the section's applicability.

Appellees first argue that district courts are vested with jurisdiction only with respect to suits for an "original allotment," *i.e.*, only if an Indian claims to have been unlawfully denied an allotment in the first instance does section 345 apply. Appellees cite *First Moon v. White Tail*, 270 U.S. 243, 245, 46 S.Ct. 246, 70 L.Ed.2d 575 (1926) for the proposition that section 345 did not

in relation to their right thereto in the proper district court of the United States; and said district courts are given jurisdiction to try and determine any action, suit, or proceeding arising within their respective jurisdictions involving the right of any person, in whole or in part of Indian blood or descent, to any allotment of land under any law or treaty (and in said suit the parties thereto shall be the claimant as plaintiff and the United States as party defendant); and the judgment or decree of any such court in favor of any claimant to an allotment of land shall have the same effect, when properly certified to the Secretary of the Interior, as if such allotment had been allowed and approved by him, but this provision shall not apply to any lands now held by either of the Five Civilized Tribes, nor to any of the lands within the Quapaw Indian Agency: *Provided,* That the right of appeal shall be allowed to either party as in other cases.

confer jurisdiction over "disputes concerning the heirs of one who held a valid and unquestioned allotment." This argument need not detain us long.

*United States v. Mottaz,* —— U.S. ——, 106 S.Ct. 2224, 90 L.Ed.2d 841 (1986), was decided after briefing and oral argument in this appeal. In *Mottaz,* an allottee's heir inherited land whose title the United States held in trust. The government sold the land to the United States Forest Service, allegedly without her consent, pursuant to 25 U.S.C. § 483, which allowed the Secretary of the Interior "upon application of the Indian owners * * * to approve conveyances, with respect to lands or interests in lands held by individual Indians * * *." She sued for the fair market value of the land. The district court granted the government's motion for summary judgment based on 28 U.S.C. § 2401(a), the general six-year statute of limitations governing actions against the United States.[8] On appeal, this court held in *Mottaz v. United States,* 753 F.2d 71 (8th Cir.1985), that no cause of action could accrue on a void transaction, and we remanded the case to the district court to determine whether the sale was in fact void, thus barring the United States' statute of limitations defense.

The Supreme Court granted certiorari and reversed on other grounds. The Court expressly declined to decide whether the six-year statute of limitations in 28 U.S.C. § 2401(a) applied to actions brought under section 345 of the Dawes Act, instead holding that the suit was within the scope of the Quiet Title Act, which applies where the United States claims an interest in the land. Thus the applicable statute of limitations was subsection (f) of the Quiet Title Act, 28 U.S.C. § 2409a.[9] The Court held that because the plaintiffs clearly had notice of the government's claim more than twelve years before filing suit, section 2409a(f) barred their claim. The Supreme Court nonetheless examined section 345 and stated:

> Section 345 grants federal district courts jurisdiction over two types of cases: (i) proceedings "involving the right of any person, in whole or in part of Indian blood or descent, to any allotment under any law or treaty," and (ii) proceedings "in relation to" the claimed right of a person of Indian descent to land that was once allotted. Section 345 thus contemplates two types of suits involving allotments: suits seeking the issuance of an allotment * * * and suits involving " 'the interests and rights of the Indian in his allotment or patent after he has acquired it' " (citations omitted).

*Mottaz,* 106 S.Ct. at 2231.

We thus conclude, based on this clear language, that section 345 gives federal district courts jurisdiction over suits involving a claim to an already existing allotment.

Appellees also argue that section 345 did not vest the district courts in this case with jurisdiction because this suit is challenging Indian land policy. They cite *Fontenelle v. Omaha Tribe of Nebraska,* 430 F.2d 143, 146 (8th Cir.1970), in which this court stated that section 345 "does not give federal District Courts the right to determine Indian land policy. (citations omitted). The Supreme Court recognized * * * that 'judicial examination' would be necessary to separate right from policy. *Arenas v. United States, supra,* 322 U.S. [419] at 432, 64 S.Ct. 1090 [at 1095–96, 88 L.Ed.2d 1363 (1944) ]."

Appellants respond that a question of right, not policy, is at issue here, and our

---

**8.** 28 U.S.C. § 2401(a) states in pertinent part:
Except as provided by the Contract Disputes Act of 1978, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues.

**9.** 28 U.S.C. § 2409a(f) states:

Any civil action under this section shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

judicial examination leads us to agree. Appellants' basic contention is that the forced fee patent scheme was illegal, and deprived them of a vested right to their allotments. Appellees cannot maintain that it was the Commissioner's policy to act illegally. We thus conclude that the district courts properly exercised jurisdiction over these cases.

Appellees next argue that section 345, which governs suits for "allotments," does not apply here because the parcels of land in question are no longer allotments. Appellees argue that because section 345 is thus inapplicable, the United States has not waived its sovereign immunity. This argument echoes Judge Bogue's finding in the district court.

Judge Bogue, in deciding that the United States retained its sovereign immunity from suit, first examined section 345 and its scope. He concluded that appellants' suit fell outside the scope of section 345 because it was "not an action for an allotment." 610 F.Supp. at 1252. Citing the definitions of "allotment" found in *Affiliated Ute Citizens of Utah v. United States*,[10] and Cohen's Handbook of Federal Indian Law,[11] he reasoned that when appellants' decedents received their fee patents, the lands lost their status as trust lands

and thus were no longer considered allotments. Judge Bogue concluded: "Applying the two definitions of allotments to the current situation, it is clear that § 345 does not apply because the action does not involve an allotment, but deals with land held in fee by the present owners. Therefore, § 345 is not a waiver of sovereign immunity."

To this reasoning, appellants respond that because the forced fee patent scheme was illegal, it was ineffective to terminate the trust, and despite the purported subsequent transfers, the land retains its status as trust land and section 345 applies. Appellants maintain that the "[district] court's reasoning was that since the court determined that plaintiffs should lose on the merits, the court therefore had no jurisdiction."

We need not resolve this issue, because assuming *arguendo* that these parcels are allotments despite the transfers, the statute of limitations in 28 U.S.C. § 2401(a) has run and bars this action as against the United States.[12]

### C. Statute of Limitations.

28 U.S.C. § 2401 provides a general six-year statute of limitations governing suits against the United States.

---

**10.** "Allotment is a term of art in Indian law. (citation omitted). It means a selection of specific land awarded to an individual allottee from a common holding. (citation omitted). Section 345 authorizes and provides governmental consent for only actions for allotments." 610 F.Supp. at 1252, quoting 406 U.S. 128, 142, 92 S.Ct. 1456, 1466, 31 L.Ed.2d 741 (1972).

**11.** "[An allotment describes] either a parcel of land owned by the United States in trust for an Indian ('trust' allotment), or owned by an Indian subject to a restriction on alienation in favor of the United States or its officials ('restricted fee' allotment)."
F. Cohen, *Handbook of Federal Indian Law* 615–16 (1982).

**12.** Dictum in *Mottaz* suggests that even a clear finding that these parcels of land are allotments might nonetheless fail to waive the sovereign immunity of the United States. The Court stated:

Section 345 thus contemplates two types of suits involving allotments: suits seeking the issuance of an allotment * * * and suits in-

volving " 'the interests and rights of the Indian in his allotment or patent after he has acquired it' " (citations omitted).
*The structure of § 345 strongly suggests, however, that § 345 itself waives the Government's immunity only with respect to the former class of cases: those seeking an original allotment. * * * Accordingly, in Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), this Court held that, to the extent that § 345 involves a waiver of federal immunity, as opposed to a grant of subject-matter jurisdiction to the district courts, that section "authorizes, and provides governmental consent for, only actions for allotments." 406 U.S., at 142, 92 S.Ct., at 1466.*
*Mottaz*, 106 S.Ct. at 2231–32 (emphasis added).
Even if this case were construed to involve an allotment, it is clearly an action "in relation to" the claimed right of an Indian to an allotment, rather than a suit "seeking the issuance of an allotment." Thus, as the Supreme Court suggests, even if these parcels are allotments, section 345 might nonetheless not waive the United States' sovereign immunity in this case.

# 1327

Appellants, citing legislative history, argue that section 2401(a) is inapplicable. Section 2401(a) derives from 28 U.S.C. § 41(20) of the 1940 Code, which they contend did not limit actions by Indians concerning their right to allotments. They argue that because the 1948 revision creating section 2401(a) did not purport to change the law as to allotments, no such change should be inferred, quoting *Anderson v. Pacific Coast Steamship Co.,* 225 U.S. 187, 199, 32 S.Ct. 626, 630, 56 L.Ed. 1047 (1912): "it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed." Appellants maintain that the sole purpose of the revision was to combine the time limit for contracts and torts into one provision. They conclude that a later, general statute of limitations has no effect on a prior, specific statute, particularly where Indian rights are involved. *Morton v. Mancari,* 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974).

Appellees, predictably, view the legislative history differently. They argue that section 2401(a) "not only served to consolidate the provisions of Section 41(20), the Tucker Act and Section 942 of Title 28 U.S.C., 1940 Ed., (footnote omitted) it also created a general statute of limitations insofar as suits against the United States are concerned." *Werner v. United States,* 188 F.2d 266, 268 (9th Cir.1951).

The Ninth Circuit has spoken clearly regarding the applicability of section 2401(a) to section 345 claims. The rationale in *Werner* was upheld in *Loring v. United States,* 610 F.2d 649, 650 (9th Cir.1979), in which section 2401(a) was invoked to dismiss an allotment claim against the United States. Most recently, in *Christensen v. United States,* 755 F.2d 705, 707 (9th Cir. 1985), the Ninth Circuit, after examining the *Loring* and *Werner* decisions, stated that "we cannot escape the conclusion that

section 2401(a) applies to *all* actions brought under section 345, whether the relief requested is legal or equitable." [13]

■ We follow the Ninth Circuit in holding that section 2401(a) applies to section 345 actions. We do so for the following reasons. First, the language of section 2401(a) is clear and definitive. "Absent a clearly expressed legislative intention to the contrary, [the] language [employed by Congress] must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

Second, we note the arguments urged by *amici* and summed up in *Lewis v. Marshall,* 30 U.S. (5 Pet.) 470, 477–78, 8 L.Ed. 195 (1831):

The best interests of society require that causes of action should not be deferred an unreasonable time. This remark is peculiarly applicable to land titles. Nothing so much retards the growth and prosperity of a country as insecurity of titles to real estate. Labor is paralyzed, where the enjoyment of its fruits is uncertain; and litigation without limit produces ruinous consequences to individuals.

It remains to determine when the statute of limitations in section 2401(a) began to run. Appellants assert that because the section was amended in 1978, that is the pertinent date setting the statute running, and because all the actions under discussion were filed within six years of 1978, they are not barred.

We reject this argument. The 1948 version of section 2401(a) read, in pertinent part, as follows:

Every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues.

---

**13.** In so concluding, the Ninth Circuit noted its awareness of *Sampson v. United States,* 533 F.2d 499 (9th Cir.1976), in which no statute of limitations was applied to a section 345 claim that had accrued in 1926. The court stated that "specula-
tion as to any *sub silentio* ruling in *Sampson* on the inapplicability of section 2401(a) to section 345 actions is rendered unnecessary by the explicit holdings in *Loring* and *Werner,* to which we are bound." *Christensen,* 755 F.2d at 708.

The 1978 revision added the following language:

> Except as provided by the Contract Disputes Act of 1978, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues. (emphasis added).

The Contract Disputes Act of 1978 has no bearing on this suit. Thus the 1978 amendment wrought no changes upon the section's effect here.

It would be untenable to hold that the 1948 enactment of section 2401(a) instantly rendered appellants' claims time-barred, as all the claims had accrued some twenty-eight years previously. In *Block v. North Dakota ex rel. Board of University and School Lands*, 461 U.S. 273, 286 n. 23, 103 S.Ct. 1811, 1819, n. 23, 75 L.Ed.2d 240 (1983), the Supreme Court noted that "[t]he Constitution * * * requires that statutes of limitations must 'allow a reasonable time after they take effect for the commencement of suits upon existing causes of action'" (citations omitted).

Conversely, it would be unfair to hold that those suits accruing before section 2401(a) was enacted were not subject to a statute of limitations, while those suits accruing after the enactment of the section were subject to its strictures.

▪ We therefore hold that the causes of action at issue here "accrued" when section 2401(a) was enacted. Thus appellants had six years from that time, June 25, 1948, in which to bring suit, which they have failed to do. Their actions are therefore time-barred.

Appellants finally argue that because the forced fee patents were void, no statute of limitations applies. They argue that because the Secretary exceeded his authority in issuing the fee patents, the patents were ineffective to terminate the trust. In this regard they cite this court's decision in *Mottaz v. United States*, 753 F.2d 71, 74 (8th Cir.1985), *rev'd*, — U.S. —, 106 S.Ct. 2224, 90 L.Ed.2d 841 (1986). In *Mottaz*, we held that a cause of action cannot accrue on a void transaction, so that if the

forced fee patents were void, the United States would have no statute of limitations defense.

We stated that "[i]t has been well established * * * that a sale of restricted allotment land in violation of the federal restrictions on its alienability does not transfer title, and that the allottee or her heirs may not be barred by state statutes of limitation or laches from bringing suit to establish that they retain title to the land." We noted, however, that "[t]he parties cite no case which squarely considered whether *Ewert [v. Bluejacket*, 259 U.S. 129, 42 S.Ct. 442, 66 L.Ed. 858 (1922)] prevents the application of *federal* statutes of limitation." We conclude that appellants' reliance on this case is misplaced for two reasons.

First, as noted, the Supreme Court reversed our reasoning in *Mottaz* after briefing and oral argument in this case. Although the Supreme Court declined to apply section 345 or section 2401(a) in *Mottaz*, a reasonable inference can be made that the Court intended a statute of limitations to be able to run on even a void transaction. The plaintiff in *Mottaz* alleged, as do appellants here, that the land sales were illegal and therefore void. The Supreme Court summarized:

> The Court of Appeals ruled that such a claim could not be time barred. * * * [T]he Court of Appeals found that § 2401(a) "does not bar claims of title to allotments because *Ewert [v. Bluejacket*, 259 U.S. 129, 42 S.Ct. 442, 66 L.Ed.2d 858 (1922)] is based on the principle that, if the underlying sale of land is void, the concept that a cause of action 'accrues' at some point is inapplicable because the allottee simply retains title all along."

*Mottaz*, 106 S.Ct. at 2228, *quoting* 753 F.2d at 74.

Although the Supreme Court reversed on other grounds, the Court's rejection of our holding is implicit in its holding that the statute of limitations in the Quiet Title Act barred the action. The Court held:

> Congress has consented to a suit challenging the Federal Government's title to

real property only if the action is brought within the 12–year period set by the Quiet Title Act. The limitations provision of the Quiet Title Act reflects a clear congressional judgment that *the national public interest requires barring stale challenges to the United States' claim to real property, whatever the merits of those challenges.*

*Mottaz,* 106 S.Ct. at 2234 (emphasis added).

By rejecting our reasoning that the case had to be remanded because the transactions were possibly void, the Supreme Court rejected our view that a statute of limitations could not run against a void patent.

Second, the facts governing the disputed land transfers in this case are significantly different from those in *Mottaz.* In our decision in *Mottaz* and the cases cited therein, the purported sales took place contrary to explicit statutory prohibitions against premature alienation. In this case, there is explicit statutory authorization for premature alienation. Appellants take issue not with the substance of the Burke Act itself, which is a federal statute authorizing alienation, but with what they contend is the Secretary's erroneous interpretation and application of that Act.[14]

This creates the dispositive distinction between the patents in *Mottaz* and the patents here: the former were possibly void, while these are possibly voidable.

The Supreme Court set out the distinction between void and voidable in *United States v. Schurz,* 102 U.S. (Otto) 378, 400–01, 26 L.Ed. 167 (1880):

But the distinction between a void and voidable instrument, though sometimes a very nice one, is still a well-recognized distinction on which valuable rights often depend. * * * The question whether any particular tract, belonging to the government, was open to sale, pre-emption, or homestead right, is in every instance a

question of law as applied to the facts for the determination of those officers. Their decision of such question and of conflicting claims to the same land by different parties is judicial in its character.

\* \* \* \* \* \*

The whole question is one of disputed law and disputed facts. It was a question for the land-officers to consider and decide before they determined to issue McBride's patent. It was within their jurisdiction to do so. If they decided erroneously, the patent may be voidable, but not absolutely void.

In *Proctor v. Painter,* 15 F.2d 974, 975 (9th Cir.1926), the court stated: "The question whether a patent from the United States for public lands is valid or invalid is not always one of easy solution. The Supreme Court has repeatedly held that patents for lands which have been previously granted, reserved or appropriated are absolutely void. (citations omitted). On the other hand, if the Land Department has jurisdiction to dispose of the land and to issue a patent therefor, an erroneous determination of the facts upon which the right to a patent depends, or an entire failure to determine such facts, will not avoid the patent."

Appellants' claim falls precisely within this second category, for they claim that the Secretary failed entirely to determine the facts necessary to trigger the issuance of their ancestors' fee patents; *i.e.,* were the ancestors competent, and did they want a fee patent. Simply put, a fee patent is void if the Secretary lacked the power to confer it. The fee patent is voidable if the Secretary had the power, but used it wrongly. Here, the power to confer the fee patents is in the Burke Act. Appellants' contend that the power was abused. The consequences of this distinction are clear. In *Schurz,* the Court stated at 401–

14. Appellants also contend that because the allotments in South Dakota were made under the 1889 Act, rather than the 1887 Dawes Act, the Burke Act, as an amendment to the Dawes Act, never applied to South Dakota. Judge Porter

disposed of this contention clearly and definitively in *Bordeaux v. Hunt,* 621 F.Supp. at 640–41. We can add nothing to his discussion on that issue and adopt it as our own.

02: "The mode of avoiding [the fee patent], if voidable, is not by arbitrarily withholding it, but by judicial proceedings to set it aside, or correct it if only partly wrong."

■ Because the fee patents at issue were not void, but possibly voidable, they were not the "nullity" that appellants propose, but were (if voidable) subject to possible nullification only upon the initiation of a suit. Because a suit was required to challenge their validity, the pertinent statute of limitations is applicable. Hence, section 2401(a) applies to appellants' claims.

Appellants argue, however, that 28 U.S.C. § 2415 waives the time limit in section 2401(a).[15] Originally enacted in 1966, section 2415 provided a limitations period of six years and ninety days for suits brought by the United States on behalf of Indians. Claims that accrued before July 18, 1966, when section 2415 was enacted, were deemed to have accrued on that date. "In 1972 and again in 1977, 1980, and 1982, as the statute of limitations was about to expire for pre–1966 claims, Congress extended the time within which the United States could bring suits on behalf of Indians." *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 105 S.Ct. 1245, 1255, 84 L.Ed.2d 169 (1985).

In the 1982 amendment, the Indian Claims Limitation Act of 1982, Pub.L. No. 97–394, 96 Stat. 1976, Congress directed the Secretary of the Interior to publish in the Federal Register a list of all Indian claims to which the statute of limitations in section 2415 applied. The Act also directed the Secretary to notify Indians potentially interested in those claims. The Indians then could submit additional claims, which were published on a second list.[16] Actions subject to the statute of limitations in section 2415 that were on neither list were barred unless begun within sixty days of the second list's publication. If the Secretary decides not to pursue a listed claim, "any right of action shall be barred unless the complaint is filed within one year after the date of publication [of the notice of the Secretary's decision] in the Federal Register."

"Congress [thus] intended to give the Indians one last opportunity to file suits covered by § 2415(a) and (b) on their own behalf. Thus, we think the statutory framework adopted in 1982 presumes the existence of an Indian right of action not otherwise subject to any statute of limitations." *Oneida*, 105 S.Ct. at 1256. Appellants rely on this language to argue that their claims are not time-barred. They claim that "Congress knew that by definition all of the forced fee cases were based on actions prior to 1966. Therefore, 28 U.S.C. § 2415 either overrides § 2401 or it affects the time that the six-year period in § 2401 starts running, *i.e.*, from the date the rejection list in the 1982 amendments to § 2415 is published."

**15.** 28 U.S.C. § 2415 states in pertinent part:

**§ 2415. Time for commencing actions brought by the United States**

(a) [E]xcept as otherwise provided by Congress, every action for money damages brought by the United States * * * which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues or within one year after final decisions have been rendered in applicable administrative proceedings required by contract or by law, whichever is later * * *. *Provided further,* That an action for money damages brought by the United States for or on behalf of a recognized tribe, band or group of American Indians shall not be barred unless the complaint is filed more than six years and ninety days after the right of action accrued * * *. *Provided,* That, for those claims that are on either of the two lists

published pursuant to the Indian Claims Limitation Act of 1982, any right of action shall be barred unless the complaint is filed within (1) one year after the Secretary of the Interior has published in the Federal Register a notice rejecting such claim * * *.

* * * * * *

(c) Nothing herein shall be deemed to limit the time for bringing an action to establish the title to, or right of possession of, real or personal property.

**16.** Mr. Gottschalk, counsel for appellants, pointed out at oral argument that: "It was basically the result of the federal government initiating an inquiry into what possible claims might exist and be subject to [section] 2415, people became aware they might have actions and that was the impetus for the filing of these lawsuits."

In deciding whether section 2401 is affected by section 2415, we are guided by familiar principles. "[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974). We find no "clearly expressed congressional intention" in section 2415 to overrule section 2401 as applied to section 345 claims brought against the United States, and we find that the two statutes are capable of coexistence. Section 2415(a) and (b) begin as follows: "Subject to the provisions of section 2416 of this title, *and except as otherwise provided by Congress * * * *"* (emphasis added). We find that Congress has clearly provided otherwise in section 2401(a).

Furthermore, as the Supreme Court stated in *Mottaz*, when confronted with this issue:

> The Indian Claims Limitation Act of 1982, 96 Stat. 1976, which amended 28 U.S.C. § 2415(a), essentially tolls—for a time—the general 6–year statute of limitations for many damages actions that may be brought *by* the Federal Government on behalf of Indians. Respondent claims that § 2415 also shows that Congress did not intend the general 6–year statute of limitations for damages actions brought *against* the Federal Government, 28 U.S.C. § 2401, to apply to her claim. *But § 2415 is expressly inapplicable to actions "to establish the title to, or right of possession of, real or personal property." 28 U.S.C. § 2415(c).*

*Mottaz*, 106 S.Ct. at 2232 n. 10 (emphasis both in original and added).

We therefore conclude that 28 U.S.C. § 2415 does not affect the running of the six-year statute of limitations in section 2401(a) in this suit.

Finally, we note that 25 U.S.C. § 347 is a possible independent source of limitation on appellants' claims.[17] The South Dakota statute of limitations for recovery of title and possession of land and for rents or profits therefrom is twenty years. *See* S.D. Codified Laws §§ 15–3–1, 15–3–2, 15–3–7 and 15–3–10 (1984). Whether the time period is measured from the date of the allottees' deeds or from the last date on which they occupied the land, it has expired.

Because the statute of limitations in section 2401(a) bars this suit against the United States, we now turn to the argument that the United States is an indispensable party, and the suit must be dismissed in its absence.

**D. Indispensable Party.**

Appellants argue that the United States, even if protected from suit by section 345 or section 2401, is not an indispensable party, and the action may proceed without it. They cite *Bird Bear v. McLean County*, 513 F.2d 190 (8th Cir.1975), stating that the United States need not be a party where the action is one to protect trust land. They argue that complete relief is available without the United States, for the land could be returned to the allottees and damages paid. They claim no substantial risk of inconsistent obligations, because the United States has refused to sue on behalf of the allottees, thus making its position clear.

Judge Bogue held the United States to be an indispensable party, requiring dismis-

---

**17.** 25 U.S.C. § 347 provides:

In all actions brought in any State court or United States court by any patentee, his heirs, grantees, or any person claiming under such patentee, for the possession or rents or profits of lands patented in severalty to the members of any tribe of Indians under any treaty between it and the United States of America, where a deed has been approved by the Secretary of the Interior to the land sought to be recovered, the statutes of limitations of the States in which said land is situate shall be held to apply, and it shall be a complete defense to such action that the same has not been brought within the time prescribed by the statutes of said State the same as if such action had been brought for the recovery of land patented to others than members of any tribe of Indians.

sal of the entire action with prejudice pursuant to Fed.R.Civ.P. 19(b).[18] Appellants, however, urge the following definition of indispensable party:

> An indispensable party is one who has such an interest in the subject-matter of the controversy that a final decree cannot be rendered between the other parties to the suit without radically and injuriously affecting his interest, or without leaving the controversy in such a situation that its final determination may be inconsistent with equity and good conscience.

*Silver King Coalition Mines Co. of Nevada v. Silver King Consolidated Mining Co. of Utah,* 204 F. 166, 169 (8th Cir.1913).

Appellants argue that under this standard, an action to protect trust land may be brought in "equity and good conscience" without involving the United States. *See Puyallup Indian Tribe v. Port of Tacoma,* 717 F.2d 1251 (9th Cir.1983), *cert. denied,* 465 U.S. 1049, 104 S.Ct. 1324, 79 L.Ed.2d 720 (1984).

In deciding this issue, we are guided by the Supreme Court's decision in *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 109–11, 88 S.Ct. 733, 737–39, 19 L.Ed.2d 936 (1968). The Court examined Rule 19(b) as follows:

> Rule 19(b) suggests four "interests" that must be examined in each case to determine whether, in equity and good conscience, the court should proceed without a party whose absence from the litigation is compelled. * * * First, the plaintiff has an interest in having a forum. * * * Second, the defendant may properly wish to avoid multiple litigation, or inconsistent relief, or sole responsibility for a liability he shares with another. * * * Third, there is the interest of the outsider whom it would have been desirable to join. * * * Fourth, there remains

the interest of the courts and the public in complete, consistent, and efficient settlement of controversies.

The Court noted that: "Whether a person is 'indispensable', that is, whether a particular lawsuit must be dismissed in the absence of that person, can only be determined in the context of particular litigation. * * * [A] court does not know whether a particular person is 'indispensable' until it has examined the situation to determine whether it can proceed without him." *Id.* at 118–19, 88 S.Ct. at 742–43.

We followed this four-part test in *Fetzer v. Cities Service Oil Co.,* 572 F.2d 1250, 1253 (8th Cir.1978), and stated that "the Supreme Court [in *Provident Tradesmens* ] rejected an inflexible and formulistic approach to joinder problems. The Court made it clear that Rule 19(b) requires a district court to undertake a 'practical examination of the circumstances,' 390 U.S. at 119–20, n. 16, 88 S.Ct. 733 [743, n. 16] in order to determine whether it must dismiss the action or may 'in equity and good conscience' proceed without an absent party."

We therefore turn to an examination of the four factors as expressed in *Provident Tradesmens.* The first factor is the plaintiff's interest in a forum.

■ This factor obviously weighs in favor of appellants. The *Provident Tradesmens* Court stated at 109, n. 3 that "[T]he court should consider whether there is any assurance that the plaintiff, if dismissed, could sue effectively in another forum where better joinder would be possible." If the action is dismissed, "better joinder" in another forum would still be an impossibility regarding the United States. The principles regarding possible sovereign immunity under section 345 and the statute of limitations for suits against the United

---

**18.** This section requires us to look at the following factors in deciding whether to dismiss a suit: first, to what extent a judgment rendered in the [United States'] absence might be prejudicial to [the United States] or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the [United States'] absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

States under section 2401(a) would still apply in another forum.

The second factor is the defendant's wish to avoid multiple litigation, inconsistent relief, or sole responsibility for liability he shares with another. This interest meshes closely with the third factor, which requires us to consider the interest of the outsider whom it would have been desirable to join. In examining these two factors, we note that if appellants prevailed in this suit, the United States would be reinstated as trustee over the land, with the concomitant resumption of fiduciary responsibility, and could also be subject to claims for damages by the present owners. Furthermore, the result of this suit, on the merits, would depend entirely on whether the United States acted legally or illegally in granting fee patents under the blood quantum policy. If the United States issued the patents legally, then appellants' action is groundless. "In short the government's liability cannot be tried 'behind its back' " (citation omitted). *Mine Safety Appliances Co. v. Forrestal,* 326 U.S. 371, 375, 66 S.Ct. 219, 221–22, 90 L.Ed. 140 (1945).

As appellants point out, the United States need not be a party defendant in all section 345 cases, "because the United States would obviously not be a proper party in many private disputes that relate to land claims originally granted by various allotment acts." *Mottaz,* 106 S.Ct. at 2231, n. 9. For instance, where an Indian allottee sold land and did not receive bargained-for consideration, *cf. Vicenti v. United States,* 470 F.2d 845 (10th Cir.1972), *cert. dismissed,* 414 U.S. 1057, 94 S.Ct. 561, 38 L.Ed.2d 343 (1973), such a dispute did not appropriately involve the United States. Another example is found in *Begay v. Albers,* 721 F.2d 1274 (10th Cir.1983), in which Indian allottees alleged that their allotments had been transferred by forged deeds. These cases sharply contrast with the present case, where the claim is based on the assertion that the United States wrongfully issued the fee patents. As this court stated in *Antoine v. United States,* 637 F.2d 1177, 1181 (8th Cir.1981): "The

United States, as the allotting agent, is the appropriate defendant in suits involving the right to an allotment. In our view, determining whether an Indian should have received a patent for an allotment of land under section 345 requires the presence of no party other than the United States." As appellee South Dakota points out: "it seems absurd to argue, as the plaintiff does, 'for an order declaring that the United States still holds the allotment in trust for [appellants] and ordering the federal defendants to ensure the necessary records reflect such title,' * * * and then assert that the United States is not indispensable." We conclude that these two factors weigh heavily in favor of appellees, and dismissal of the action.

The fourth factor to consider is the interest of the courts and the public in complete, consistent, and efficient settlement of controversies. In this regard, we note Judge Bogue's observations that:

> Thus, these forced fee patent claims have far reaching social, economic, and political ramifications * * *. Title to millions of acres of land is clouded, thus affecting real estate transactions, probate proceedings, and credit availability. In other words, thousands of landowners are effectively barred from selling their land.

> Another ramification involves the validity of a fee patent issued by the U.S. Government. If these fee patents can be successfully attacked, the entire United States title system is in jeopardy. Title insurance companies, who relied on the fee patent, would face financial ruin. "The return of the land to trust status would potentially result in a checkerboard effect on civil and criminal jurisdiction, and would certainly remove the land from the tax base of the county and local school district."

*Nichols,* 610 F.Supp. at 1254 (quoting LaFave, 30 S.D.L.Rev. 60, 96 (1985)).

In view of the above, we conclude that this factor as well weighs in favor of dismissal of the action.

Examining these four factors, we conclude that the absence of the United States from this suit requires dismissal of the suit in its entirety, with prejudice, against all appellants.

Accordingly, we affirm the district courts' grants of summary judgment.[19]

19. We note independent grounds for dismissal of the suit against appellee South Dakota. In their amended complaint, appellants asserted a cause of action under 42 U.S.C. § 1983 against South Dakota. South Dakota asserted eleventh amendment immunity as an affirmative defense. Although neither issue was briefed by the parties, we find South Dakota's defense valid. Section 1983 provides a cause of action only against "person[s]." A state is immune from a section 1983 suit under the eleventh amendment. Appellants also impermissibly seek damages against South Dakota rather than the prospective injunctive relief contemplated by section 1983. *See Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). *See also County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 105 S.Ct. 1245, 1260–61, 84 L.Ed.2d 169 (1985). Furthermore, in *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), the Supreme Court held that all section 1983 claims are governed by the appropriate state statute of limitations for personal injury actions. The appropriate statute in this case is S.D. Codified Laws 15–12–14(3) (1984), which runs three years after the cause of action accrues and thus has long expired.